Max Gershenoff (MG 4648)
Joshua D. Smith (JS 3989)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

----------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE COMPANY,
GEICO INDEMNITY COMPANY, GEICO GENERAL
INSURANCE COMPANY, and GEICO CASUALTY
COMPANY,

                              Plaintiffs,

                   -against-

FRANCOIS JULES PARISIEN, M.D. a/k/a JULES
FRANCOIS PARISIEN, PFJ MEDICAL CARE P.C., JPF
MEDICAL SERVICES, P.C., HARRY KEITH MONROE,
M.D., FRANCIS J. LACINA, D.O., JFL MEDICAL CARE
P.C., FJL MEDICAL SERVICES P.C., RENEE ANN
DENOBREGA, SHANEEZA O'BRIAN, SUSAN TUANO,
WILMA TANGLAO, and JOHN DOE
DEFENDANTS 1-10,

                             Defendants.

----------------------------------------------------------------------X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

## NATURE OF THE ACTION

1.    This action seeks to recover more than $930,000.00 that the Defendants wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise unreimbursable healthcare services, including trigger point injections, "dry needling" injections, and medical examinations (collectively the "Fraudulent Services") allegedly provided to New York automobile accident victims ("Insureds").

2.    The Fraudulent Services were provided, to the extent that they were provided at all, pursuant to the dictates of unlicensed non-physicians that illegally owned and controlled five transient medical practices: Defendants PFJ Medical Care P.C. ("PFJ Medical"), JPF Medical Services, P.C. ("JPF Medical"), JFL Medical Care P.C. ("JFL Medical"), and FJL Medical Services P.C. ("FJL Medical"), as well as an unincorporated medical practice operating under Defendant Harry Keith Monroe, M.D.'s professional license ("HKM Medical").

3.    In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,000,000.00 in pending no-fault insurance claims that have been submitted by or on behalf of PFJ Medical, JPF Medical, JFL Medical, FJL Medical, and HKM Medical because:

    (i)    the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

    (ii)   in many cases, the Fraudulent Services never were provided in the first instance;

    (iii)  the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

2

(iv)    in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants or their employees;

(v)     PFJ Medical, JPF Medical, JFL Medical, and FJL Medical were fraudulently incorporated, owned, and controlled by unlicensed individuals and entities, unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits;

(vi)    HKM Medical unlawfully was owned and controlled by unlicensed individuals and entities, unlawfully split fees with unlicensed individuals and entities and, therefore, was ineligible to bill for or to collect no-fault benefits; and

(vii)   the Fraudulent Services were provided pursuant to illegal kickback arrangements between the Defendants and the owners and controllers of purported multi-disciplinary healthcare clinics (the "Clinics") where the Defendants purported to provide the Fraudulent Services.

4.      The Defendants fall into the following categories:

(i)     PFJ Medical, JPF Medical, JFL Medical, FJL Medical, and HKM Medical (collectively the "Provider Defendants") are fraudulently incorporated medical professional corporations (or, in the case of HKM Medical, an unincorporated medical practice) through which the Fraudulent Services purportedly were performed and billed to insurance companies, including GEICO.

(ii)    Defendants Francois Jules Parisien a/k/a Jules Francois Parisien, M.D. ("Parisien"), Harry Keith Monroe, M.D. ("Monroe"), and Francis J. Lacina, D.O. ("Lacina") (collectively the "Nominal Owner Defendants") are licensed physicians that falsely purported to own and control the Provider Defendants, and purported to perform many of the Fraudulent Services.

(iii)   Defendants Renee Ann Denobrega ("Denobrega") and Shaneeza O'Brian ("O'Brian") are two nurse practitioners who were associated with JPF Medical and PFJ Medical as independent contractors, and purported to perform many of the Fraudulent Services at JPF Medical and PFJ Medical.

(iv)    Defendants Susan Tuano ("Tuano"), Wilma Tanglao ("Tanglao"), and John Doe Defendants 1-10 (collectively the "Management Defendants") are not and never have been licensed as physicians, yet nonetheless secretly and unlawfully owned, controlled, and derived economic benefit from the Provider Defendants' healthcare practices in contravention of New York law.

5.      As discussed below, Defendants at all relevant times have known that:

3

(i)     the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(ii)    in many cases, the Fraudulent Services never were provided in the first instance;

(iii)   the billing codes used for the Fraudulent Services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO;

(iv)    in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants or their employees;

(v)     PFJ Medical, JPF Medical, JFL Medical, and FJL Medical were fraudulently incorporated, owned, and controlled by unlicensed individuals and entities, unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits;

(vi)    HKM Medical unlawfully was owned and controlled by unlicensed individuals and entities, unlawfully split fees with unlicensed individuals and entities and, therefore, was ineligible to bill for or to collect no-fault benefits; and

(vii)   the Fraudulent Services were provided pursuant to illegal kickback arrangements between the Defendants and the owners and controllers of the multi-disciplinary healthcare clinics (the "Clinics") where the Defendants purported to provide the Fraudulent Services.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that have been billed to GEICO through the Provider Defendants.

7.      The charts annexed hereto as Exhibits "1" – "5" set forth a representative sample of the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

8.      The Defendants' fraudulent scheme began as early as 2015 and has continued uninterrupted through the present day.

4

9.     As a result of the Defendants' scheme, GEICO has incurred damages of more than $930,000.00.

## THE PARTIES

### I.     Plaintiffs

10.     Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.     Defendants

11.     Defendant Parisien resides in and is a citizen of New York. Parisien was licensed to practice medicine in New York on January 25, 1972, falsely purported to own and control Defendants PFJ Medical and JPF Medical, and purported to provide many of the Fraudulent Services.

12.     Defendant PFJ Medical is a fraudulently incorporated New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

13.     PFJ Medical was fraudulently incorporated on July 31, 2015, nominally is owned on paper by Parisien, but in actuality has always been owned and controlled by unlicensed non-physicians in contravention of New York law.

14.     Defendant JPF Medical is a fraudulently incorporated New York medical professional corporation with its principal place of business in New York, through which many

5

of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

15.    JPF Medical was fraudulently incorporated on September 23, 2016, nominally is owned on paper by Parisien, but in actuality has always been owned and controlled by unlicensed non-physicians in contravention of New York law.

16.    Defendant Monroe resides in and is a citizen of Illinois. Monroe was licensed to practice medicine in New York on January 8, 2016, falsely purported to own and control HKM Medical, and purported to provide many of the Fraudulent Services.

17.    Upon information and belief, Monroe operates a full-time cosmetic surgery practice in the state of Illinois.

18.    HKM Medical is an unincorporated medical practice that is purportedly owned by Monroe, but in actuality has been owned and controlled by unlicensed non-physicians since at least May 31, 2016.

19.    Defendant Lacina resides in and is a citizen of New York. Lacina was licensed to practice medicine in New York on September 26, 2012, falsely purported to own and control Defendants JFL Medical and FJL Medical, and purported to provide many of the Fraudulent Services.

20.    Defendant JFL Medical is a fraudulently incorporated New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

21.    JFL Medical was fraudulently incorporated on September 23, 2016, nominally is owned on paper by Lacina, but in actuality has always been owned and controlled by unlicensed non-physicians in contravention of New York law.

22.    Defendant FJL Medical is a fraudulently incorporated New York medical professional corporation with its principal place of business in New York, through which many of the Fraudulent Services purportedly were provided and billed to insurance companies, including GEICO.

23.    FJL Medical was fraudulently incorporated on June 24, 2016, nominally is owned on paper by Lacina, but in actuality has always been owned and controlled by unlicensed non-physicians in contravention of New York law.

24.    Defendant Denobrega resides in and is a citizen of Pennsylvania. Denobrega was licensed as a nurse practitioner in New York on September 23, 2013, was associated with JPF Medical and PFJ Medical as an independent contractor, and purported to perform many of the Fraudulent Services at JPF Medical and PFJ Medical.

25.    In March 2015, the Brooklyn District Attorney charged Denobrega, among many others, with participation in a massive Medicaid fraud scheme in which they lured people recruited from low-income neighborhoods, homeless shelters, and welfare offices to corrupt medical clinics for unnecessary tests with the promise of free footwear such as sneakers, shoes and boots.

26.    According to the Brooklyn District Attorney, Denobrega charged inflated fees for abbreviated patient visits, and referred patients to others in the criminal enterprise for costly, frequent, and unnecessary tests and procedures.

27.     Upon information and belief, the record of Denobrega's indictment – which is available to prospective employers via a simple internet search – made it virtually impossible for her to obtain legitimate employment in the healthcare industry, and contributed to her motive to participate in the fraudulent scheme described herein.

28.     Defendant O'Brian resides in and is a citizen of New York. O'Brian was licensed as a nurse practitioner in New York on December 5, 2013, was associated with JPF Medical and PFJ Medical as an independent contractor, and purported to perform many of the Fraudulent Services at JPF Medical and PFJ Medical.

29.     Defendant Tuano resides in and is a citizen of New York. Tuano has never been a licensed medical professional, yet has owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law.

30.     Defendant Tanglao resides in and is a citizen of New York. Tanglao has never been a licensed medical professional, yet has owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law.

31.     Upon information and belief, John Doe Defendants 1 – 10 reside in and are citizens of New York. John Doe Defendants 1 – 10 are individuals and entities, presently not identifiable, who are not and never have been licensed physicians, yet – together with Tuano and Tanglao – have owned, controlled, and derived economic benefit from the Provider Defendants in contravention of New York law.

**JURISDICTION AND VENUE**

32.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

33.    Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.

34.    In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

35.    Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.    **An Overview of the No-Fault Laws and Licensing Statutes**

36.    GEICO underwrites automobile insurance in New York.

37.    New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need.  Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

38.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services, physical therapy services, and acupuncture services.

39.    An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.  Pursuant to a duly executed assignment, a health

care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

40. Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

41. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

42. In New York, only a licensed healthcare professional may: (i) practice the pertinent healthcare profession; (ii) own and control a professional corporation authorized to operate a professional healthcare practice; (iii) employ and supervise other healthcare professionals; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from healthcare professional services. Unlicensed individuals may not: (i) practice the pertinent healthcare profession; (ii) own or control a professional corporation authorized to operate a professional healthcare practice; (iii) employ or supervise healthcare professionals; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from professional healthcare services.

43.    New York law prohibits licensed healthcare providers from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6531.

44.    Additionally, New York law requires the shareholders of a medical professional corporation to be engaged in the practice of the profession through the professional corporation in order for it to be lawfully licensed. See, e.g., N.Y. Business Corporation Law § 1507.

45.    Therefore, under the No-Fault Laws, a healthcare provider is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, if it engages in unlawful fee-splitting with unlicensed non-professionals, if it pays or receives unlawful kickbacks in exchange for patient referrals, or if its record owner does not practice his or her profession through the professional corporation.

46.    In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

47.    Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

48.    Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the

actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

49.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    The First Parisien Action and the Antecedents of the Defendants' Fraudulent Scheme

50.    Several of the Defendants have a history of operating fraudulent medical practices and using them as vehicles to submit large-scale, fraudulent no-fault insurance billing to GEICO and other insurers.

51.    For example, in February 2016, GEICO sued Parisien, Lacina, Tuano, and Tanglao – among others – in an action entitled Government Employees Insurance Co., et al. v. Parisien, et al., E.D.N.Y. Case No. 1:16-cv-00818-RRM-RER (the "First Parisien Action").

52.    In the First Parisien Action – much as in the present case – GEICO alleged, among other things, that Parisien and Lacina falsely posed as the nominal or "paper" owners of medical practices that secretly and unlawfully were owned and controlled behind the scenes by Tuano and Tanglao, among others, who used them as vehicles to submit a large amount of fraudulent no-fault insurance billing to GEICO and other insurers.

53.     In the First Parisien Action – much as in the present case – the medical practices that nominally were owned on paper by Parisien and Lacina, but actually were unlawfully owned and controlled by Tuano and Tanglao, among others, operated from, among other places, a purported multi-disciplinary healthcare clinic located at 1786 Flatbush Avenue, in Brooklyn, New York.

54.     Shortly after discovery commenced in the First Parisien Action, GEICO served subpoenas on Parisien and Lacina's banks, seeking Parisien and Lacina's bank records during the period when the events giving rise to the First Parisien Action occurred.

55.     Parisien and Lacina moved to quash or modify GEICO's bank subpoenas, contending – in substance – that the subpoenas were overly broad.

56.     GEICO opposed Parisien and Lacina's motion to quash, noting – among other things – that Parisien and Lacina's bank records were highly relevant to prove GEICO's allegations that Parisien and Lacina's medical practices were secretly and unlawfully owned and controlled by unlicensed non-physicians, including Tuano and Tanglao.

57.     Ultimately, the Court in the First Parisien Action denied Parisien and Lacina's motion to quash in its entirety, based on a determination that the bank records sought by the subpoenas were relevant to GEICO's claims.

58.     Parisien, Lacina, Tuano, and Tanglao were very concerned that disclosure of Parisien and Lacina's bank records would tend to prove GEICO's allegations that Parisien and Lacina's medical practices were secretly and unlawfully owned and controlled by unlicensed non-physicians, including Tuano and Tanglao.

59.     Accordingly, shortly after the Court in the First Parisien Action denied Parisien and Lacina's motion to quash GEICO's bank subpoenas, Parisien, Lacina, Tuano, and Tanglao entered into a settlement with GEICO in the First Parisien Action.

60.     Parisien executed the settlement agreement in the First Parisien Action on August 26, 2016.

61.     Pursuant to the settlement agreement in the First Parisien Action, Parisien warranted and represented that – other than an entity called Francois Jules Parisien M.D., P.C. – he owned no other professional entities, regardless of form, that had submitted any billing of any kind to GEICO that remained outstanding and unpaid.

62.     However, on August 26, 2016 – the date when Parisien executed the settlement agreement in the First Parisien Action – Parisien purported to be the owner of record of PFJ Medical.

63.     What is more, on August 26, 2016 – the date when Parisien executed the settlement agreement in the First Parisien Action – PFJ Medical had thousands of dollars in outstanding billing to GEICO.

64.     Lacina executed the settlement agreement in the First Parisien Action on August 24, 2016

65.     Pursuant to the settlement agreement in the First Parisien Action, Lacina warranted and represented that – other than an entity called RA Medical Services, P.C. – he owned no other professional entities, regardless of form, that had submitted any billing of any kind to GEICO that remained outstanding and unpaid.

66.     However, on August 24, 2016 – the date when Lacina executed the settlement agreement in the First Parisien Action – Lacina purported to be the owner of record of FJL Medical.

67.     What is more, on August 24, 2016 – the date when Lacina executed the settlement agreement in the First Parisien Action – FJL Medical had thousands of dollars in outstanding billing to GEICO.

## III.   The Defendants' Fraudulent Scheme

### A.   The Fraudulent Incorporation of PFJ Medical, FJL Medical, JPF Medical, and JFL Medical

68.     As set forth above, when they executed the settlement agreement in the First Parisien Action, both Parisien and Lacina gave representations and warranties to the effect that they did not, respectively, own PFJ Medical and FJL Medical – two professional entities that had submitted billing to GEICO that remained outstanding and unpaid.

69.     The reason why Parisien and Lacina gave these representations and warranties was that they never really owned or controlled PFJ Medical or FJL Medical in the first place.

70.     Rather, true ownership of and control over PFJ Medical and FJL Medical rested at all times with the Management Defendants.

71.     Specifically, in mid-2015, the Management Defendants were growing concerned that GEICO's investigation of other medical practices that nominally were owned on "paper" by Parisien and Lacina – the investigation that ultimately led to the First Parisien Action – would uncover the Management Defendants' secret and unlawful ownership interests in those practices.

72.     Accordingly, in mid-2015, the Management Defendants decided to begin fraudulently incorporating a series of new professional corporations, with new tax identification numbers, in the expectation that GEICO would not realize that the new entities – like the other

medical practices that nominally were owned on "paper" by Parisien and Lacina – were fraudulently incorporated.

73.     Toward that end, in mid-2015 the Management Defendants once again approached Parisien, and once again offered to purchase the use of his medical license so that they could fraudulently incorporate PFJ Medical.

74.     In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing PFJ Medical to operate a medical practice, the Management Defendants once again entered into a secret scheme with Parisien. In exchange for a designated salary or other form of compensation, in mid-2015 Parisien agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the triennial statements filed thereafter, that he was the true shareholder, director and officer of PFJ Medical and that he truly owned and controlled the professional corporation.

75.     As he had done in the past with other medical practices that he falsely purported to own, once PFJ Medical was fraudulently incorporated on July 31, 2015, Parisien ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

76.     The Management Defendants – rather than Parisien – provided all start-up costs and investment in PFJ Medical. Parisien did not incur any costs to establish PFJ Medical's practice, nor did he invest any money in the professional corporation he purportedly owned.

77.     Thereafter, the Management Defendants caused PFJ Medical to commence operations on a transient basis from the Clinics, by paying kickbacks to the owners of the Clinics in exchange for patient referrals to PFJ Medical.

78.     Parisien never was the true shareholder, director, or officer of PFJ Medical, and never had any true ownership interest in or control over the professional corporation. True

ownership and control over PFJ Medical always rested entirely with the Management Defendants, who used the façade of PFJ Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ physicians; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

79.     Parisien exercised absolutely no control over or ownership interest in PFJ Medical. All decision-making authority relating to the operation and management of PFJ Medical was vested entirely with the Management Defendants. In addition, Parisien never controlled or maintained any of PFJ Medical's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of PFJ Medical's financial affairs; never hired or supervised any of PFJ Medical's employees or independent contractors; and was completely unaware of the most fundamental aspects of how PFJ Medical operated.

80.     In reality, Parisien was nothing more than the Management Defendants' de facto employee at PFJ Medical.

81.     To conceal their true ownership of and control over PFJ Medical, while simultaneously effectuating pervasive, total control over the operation and management of PFJ Medical, the Management Defendants arranged to have Parisien and PFJ Medical enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements with themselves. These agreements called for exorbitant payments from PFJ Medical to the Management Defendants, for office space and the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of PFJ Medical's business; or (ii) the income generated by PFJ Medical.

82.     While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own PFJ Medical; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through PFJ Medical.

83.     The net effect of these "management", "billing", "marketing", and "lease" agreements between Parisien, PFJ Medical, and the Management Defendants was to maintain PFJ Medical in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

84.     As noted above, the Court in the First Parisien Action denied Parisien and Lacina's motion to quash GEICO's bank subpoenas in its entirety, based on a determination that the bank records sought by the subpoenas were relevant to GEICO's claims in the First Parisien Action.

85.     The Court in the First Parisien Action denied Parisien and Lacina's motion to quash GEICO's bank subpoenas on June 23, 2016.

86.     The Management Defendants knew that – once GEICO obtained Lacina's bank records – the bank records would tend to prove that the Management Defendants secretly and unlawfully owned and controlled Lacina's medical practice. That is why they hastened to settle the First Parisien Action with GEICO shortly after the Court in the First Parisien Action denied the motion to quash GEICO's bank subpoenas.

87.     On June 24, 2016 – <u>the very next day after the Court in the First Parisien Action denied Parisien and Lacina's motion to quash GEICO's bank subpoenas</u> – the Management Defendants approached Lacina, once again purchased the use of Lacina's medical license so that they could fraudulently incorporate FJL Medical, and caused FJL Medical to be fraudulently incorporated.

88.     The Management Defendants and Lacina caused FJL Medical to be fraudulently incorporated <u>the day after</u> the Court in the First Parisien Action denied Parisien and Lacina's motion to quash GEICO's bank subpoenas because they were concerned that – with the impending disclosure of Lacina's bank records – GEICO would be able to prove that the previous medical practice that nominally was owned on "paper" by Lacina actually was secretly and unlawfully owned and controlled by the Management Defendants. The Management Defendants therefore caused FJL Medical to be fraudulently incorporated on June 24, 2016 as a replacement for Lacina's previous medical practice, which they also illegally owned and controlled.

89.     In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing FJL Medical to operate a medical practice, the Management Defendants once again entered into a secret scheme with Lacina. In exchange for a designated salary or other form of compensation, on June 24, 2016 Lacina agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the triennial statements filed thereafter, that he was the true shareholder, director and officer of FJL Medical and that he truly owned and controlled the professional corporation.

90.     As he had done in the past with other medical practices that he falsely purported to own, once FJL Medical was fraudulently incorporated on June 24, 2016, Lacina ceded true beneficial ownership and control over the professional corporation to the Management Defendants.

91.     The Management Defendants – rather than Lacina – provided all start-up costs and investment in FJL Medical. Lacina did not incur any costs to establish FJL Medical's practice, nor did he invest any money in the professional corporation he purportedly owned.

92.     Thereafter, the Management Defendants caused FJL Medical to commence operations on a transient basis from the Clinics, by paying kickbacks to the owners of the Clinics in exchange for patient referrals to FJL Medical.

93.     Lacina never was the true shareholder, director, or officer of FJL Medical, and never had any true ownership interest in or control over the professional corporation. True ownership and control over FJL Medical always rested entirely with the Management Defendants, who used the façade of FJL Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ physicians; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

94.     Lacina exercised absolutely no control over or ownership interest in FJL Medical. All decision-making authority relating to the operation and management of FJL Medical was vested entirely with the Management Defendants. In addition, Lacina never controlled or maintained any of FJL Medical's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of FJL Medical's financial affairs; never hired or supervised any of FJL Medical's employees or independent contractors; and was completely unaware of the most fundamental aspects of how FJL Medical operated.

95.    In reality, Lacina was nothing more than the Management Defendants' de facto employee at FJL Medical.

96.    To conceal their true ownership of and control over FJL Medical, while simultaneously effectuating pervasive, total control over the operation and management of FJL Medical, the Management Defendants arranged to have Lacina and FJL Medical enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements with themselves. These agreements called for exorbitant payments from FJL Medical to the Management Defendants, for office space and the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of FJL Medical's business; or (ii) the income generated by FJL Medical.

97.    While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own FJL Medical; and (ii) to siphon all of the profits that were generated by the billings submitted to GEICO and other insurers through FJL Medical.

98.    The net effect of these "management", "billing", "marketing", and "lease" agreements between Lacina, FJL Medical, and the Management Defendants was to maintain FJL Medical in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

99.    By September 2016, not even PFJ Medical and FJL Medical were sufficient to serve as vehicles for the massive amount of fraudulent no-fault insurance billing that the

Management Defendants – with the knowing and indispensable assistance of Parisien and Lacina – wanted to submit to GEICO and other insurers.

100.    Specifically, the Management Defendants, Parisien, and Lacina were growing concerned that the massive amount of fraudulent no-fault insurance billing they submitted or caused to be submitted through PFJ Medical and FJL Medical would draw scrutiny from insurer investigative departments, regulatory authorities, and law enforcement.

101.    Accordingly, in September 2016, the Management Defendants once again approached Parisien, and once again offered to purchase the use of Parisien's medical license, so that they could fraudulently incorporate JPF Medical.

102.    At the same time, in September 2016, the Management  Defendants also approached Lacina, and once again offered to purchase the use of Lacina's medical license, so that they could fraudulently incorporate JFL Medical.

103.    In order to circumvent New York law and to induce the State Education Department to issue certificates of authority authorizing JPF Medical and JFL Medical to operate medical practices, the Management Defendants once again entered into secret schemes with Parisien and Lacina.

104.    In exchange for designated salaries or other forms of compensation, in September 2016 Parisien and Lacina agreed to falsely represent in the certificates of incorporation filed with the Department of Education, and the triennial statements filed thereafter, that they were the true shareholders, directors and officers of JPF Medical and JFL Medical, respectively, and that they truly owned and controlled the respective professional corporations.

105.    As they had done in the past with other medical practices that they falsely purported to own – including PFJ Medical and FJL Medical – once JPF Medical and JFL Medical

were fraudulently incorporated on September 23, 2016, Parisien and Lacina ceded true beneficial ownership and control over the professional corporations to the Management Defendants.

106.    The Management Defendants – rather than Parisien or Lacina – provided all start-up costs and investment in JPF Medical and JFL Medical. Parisien and Lacina did not incur any costs to establish JPF Medical and JFL Medical's practices, nor did they invest any money in the professional corporations they purportedly owned.

107.    Thereafter, the Management Defendants caused JPF Medical and JFL Medical to commence operations on a transient basis from the Clinics, by paying kickbacks to the owners of the Clinics in exchange for patient referrals to JPF Medical and JFL Medical.

108.    Parisien and Lacina never were the true shareholders, directors, or officers of JPF Medical and JFL Medical, respectively, and never had any true ownership interests in or control over the professional corporations. True ownership and control over JPF Medical and JFL Medical always rested entirely with the Management Defendants, who used the façade of JPF Medical and JFL Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ physicians; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

109.    Parisien and Lacina exercised absolutely no control over or ownership interest in JPF Medical and JFL Medical, respectively. All decision-making authority relating to the operation and management of JPF Medical and JFL Medical was vested entirely with the Management Defendants.

110.    In addition, Parisien never controlled or maintained any of JPF Medical's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of JPF Medical's financial affairs; never

hired or supervised any of JPF Medical's employees or independent contractors; and was completely unaware of the most fundamental aspects of how JPF Medical operated.

111.   In reality, Parisien was nothing more than the Management Defendants' de facto employee at JPF Medical.

112.   Likewise, Lacina never controlled or maintained any of JFL Medical's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of JFL Medical's financial affairs; never hired or supervised any of JFL Medical's employees or independent contractors; and was completely unaware of the most fundamental aspects of how JFL Medical operated.

113.   In reality, Lacina was nothing more than the Management Defendants' de facto employee at JFL Medical.

114.   To conceal their true ownership of and control over JPF Medical and JFL Medical, while simultaneously effectuating pervasive, total control over the operation and management of JPF Medical and JFL Medical, the Management Defendants arranged to have Parisien and JPF Medical, and Lacina and JFL Medical, enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements with themselves. These agreements called for exorbitant payments from JPF Medical and JFL Medical to the Management Defendants, for office space and the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of JPF Medical and JFL Medical's business; or (ii) the income generated by JPF Medical and JFL Medical.

115.   While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management

Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own JPF Medical and JFL Medical; and (ii) to siphon all of the profits that have been generated by the billings submitted to GEICO and other insurers through JPF Medical and JFL Medical,

116.    The net effect of these "management", "billing", "marketing", and "lease" agreements between Parisien, JPF Medical, Lacina, JFL Medical, and the Management Defendants was to maintain JPF Medical and JFL Medical in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporations, their accounts receivable, and any revenues that might be generated therefrom.

117.    As set forth above, and in keeping with the fact that JPF Medical and JFL Medical were secretly and unlawfully owned and controlled by the Management Defendants – rather than by Parisien or Lacina – JPF Medical and JFL Medical were fraudulently incorporated on the exact same date, September 23, 2016.

118.    JPF Medical and JFL Medical purported to provide the same types of healthcare services as PFJ Medical and FJL Medical, and operated from the same Clinics as PFJ Medical and FJL Medical.

119.    There was no legitimate reason why Parisien, who already falsely purported to own PFJ Medical, would need to incorporate JPF Medical, a second professional corporation that provided the same types of services as PFJ Medical, at the same Clinics as PFJ Medical.

120.    There was no legitimate reason why Lacina, who already falsely purported to own FJL Medical, would need to incorporate JFL Medical, a second professional corporation that provided the same types of services as FJL Medical, at the same Clinics as FJL Medical.

121.    The reason why Parisien and Lacina agreed to be listed as the purported "owners" of multiple medical professional corporations, which purported to simultaneously provide substantially the same types of services, at the same locations, was because Parisien and Lacina did not actually own or control PFJ Medical, JPF Medical, FJL Medical, or JFL Medical at all.

122.    Rather, the Management Defendants secretly and unlawfully owned and controlled PFJ Medical, JPF Medical, FJL Medical, and JFL Medical.

123.    With the indispensable assistance of Parisien and Lacina, the Management Defendants conducted their scheme through multiple medical professional corporations, using different tax identification numbers, in order to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number, avoid detection, and thereby perpetuate their fraudulent scheme and increase their ill-gotten gains.

**B.    The Fraudulent Establishment of HKM Medical**

124.    GEICO filed the First Parisien Action on February 17, 2016. Thereafter, on April 29, 2016, GEICO asked the Court in the First Parisien Action to schedule the initial conference and to direct the parties to meet and confer to establish a discovery schedule.

125.    On May 4, 2016, the Defendants in the First Parisien Action – including Parisien, Lacina, Tuano, and Tanglao – opposed GEICO's request for an initial conference, contending, in substance, that they intended to file motions to dismiss and that discovery would be premature given the pendency of their prospective motions to dismiss.

126.    Nonetheless, on May 5, 2016, the Court in the First Parisien Action scheduled the initial conference in the First Parisien Action, for June 14, 2016.

127.    With discovery about to commence in the First Parisien Action, the Management Defendants were concerned that discovery would reveal their secret and unlawful ownership interests in the medical practices operated under Parisien and Lacina's medical licenses.

128.    By extension, the Management Defendants were concerned that they would be unable to continue to use Parisien and Lacina as the nominal or "paper" owners of fraudulently incorporated medical practices.

129.    Accordingly, in May 2016, the Management Defendants commenced a search for yet another pliable physician who would be willing to sell the use of his medical license to them.

130.    Thereafter, in May 2016, the Management Defendants recruited Monroe into their scheme. Like Parisien and Lacina before him, Monroe – in exchange for a designated salary or other form of compensation from the Management Defendants – agreed to serve as the nominal or "paper" owner of HKM Medical, which ostensibly was an unincorporated sole proprietorship medical practice, but actually was secretly and unlawfully owned and controlled by the Management Defendants.

131.    As with PFJ Medical, FJL Medical, JPF Medical, and JFL Medical, the Management Defendants provided all start-up costs and investment in HKM Medical. Monroe did not incur any costs to establish HKM Medical's practice, nor did he invest any money in the medical practice he purportedly owned.

132.    Thereafter – and as with PFJ Medical, FJL Medical, JPF Medical, and JFL Medical – the Management Defendants caused HKM Medical to commence operations on a transient basis from the Clinics, by paying kickbacks to the owners of the Clinics in exchange for patient referrals to HKM Medical.

133.    Monroe never was the true owner of HKM Medical, and never had any true ownership interest in or control over the medical practice. True ownership and control over HKM Medical always rested entirely with the Management Defendants, who used the façade of HKM Medical to do indirectly what they were forbidden from doing directly, namely: (i) employ physicians; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

134.    Monroe exercised absolutely no control over or ownership interest in HKM Medical. All decision-making authority relating to the operation and management of HKM Medical was vested entirely with the Management Defendants. In addition, Monroe never controlled or maintained any of HKM Medical's books or records, including its bank account; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of HKM Medical's financial affairs; never hired or supervised any of HKM Medical's employees or independent contractors; and was completely unaware of the most fundamental aspects of how HKM Medical operated.

135.    In reality, Monroe was nothing more than the Management Defendants' de facto employee at HKM Medical.

136.    To conceal their true ownership of and control over HKM Medical, while simultaneously effectuating pervasive, total control over the operation and management of HKM Medical, the Management Defendants arranged to have Monroe enter into a series of "management", "billing", "marketing", "consulting", and "lease" agreements with themselves. These agreements called for exorbitant payments from HKM Medical to the Management Defendants, for office space and the alleged performance of certain designated services including

management, marketing, billing, and collections, regardless of: (i) the volume of HKM Medical's business; or (ii) the income generated by HKM Medical.

137.    While these agreements ostensibly were created to permit the Management Defendants to provide "management", "billing", "consulting", and "marketing" services, or facility space and equipment, they actually were used solely as a tool to permit the Management Defendants to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own HKM Medical; and (ii) to siphon all of the profits that have been generated by the billings submitted to GEICO and other insurers through HKM Medical.

138.    The net effect of these "management", "billing", "marketing", and "lease" agreements between Monroe, HKM Medical, and the Management Defendants was to maintain HKM Medical in a constant state of debt to the Management Defendants, thereby enabling the Management Defendants to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

139.    Upon information and belief, in keeping with the fact that Monroe never had any legitimate ownership interest in or control over HKM Medical, Monroe never even practiced medicine through HKM Medical.

140.    For example, during the same period when he was falsely purporting to serve as the owner of HKM Medical in New York, and to practice medicine through HKM Medical in New York, Monroe maintained an active medical practice in Buffalo Grove, Illinois.

141.    Moreover, Monroe did not personally sign any of the bills that were submitted through HKM Medical to GEICO.

142.    What is more, though the treatment notes that were submitted through HKM Medical to GEICO purported to bear Monroe's signature, and purported to have been completed

by Monroe: (i) Monroe's signature was applied to the treatment notes using a signature stamp; and (ii) the treatment notes, though ostensibly completed by Monroe, were completed in widely disparate handwriting.

## C.    The Multi-Disciplinary Clinics and Kickbacks

143.    In keeping with the fact that the Provider Defendants were not truly owned or controlled by the Nominal Owner Defendants, the Provider Defendants did not advertise or market their services to the general public, did not maintain stand-alone practices, and were not the owners of or leaseholders of the real property from which they purported to provide the Fraudulent Services.

144.    Instead, the Provider Defendants operated on an itinerant basis from the Clinics, which were situated at – among other places – the following locations:

(i)        1552 Ralph Avenue, Brooklyn, New York;

(ii)       1220 East New York Avenue, Brooklyn, New York;

(iii)      1468 Flatbush Avenue, Brooklyn, New York;

(iv)      172-17 Jamaica Avenue, Jamaica, New York;

(v)       1786 Flatbush Avenue, Brooklyn, New York;

(vi)      2184 Flatbush Avenue, Brooklyn, New York;

(vii)     2363 Ralph Avenue, Brooklyn, New York;

(viii)    2430 Davidson Avenue, Bronx, New York;

(ix)      3209 Fulton Street, Brooklyn, New York;

(x)       3250 Westchester Avenue, Bronx, New York;

(xi)      3920 Veterans Memorial Highway, Bohemia, New York;

(xii)     3407 White Plains Road, Bronx, New York;

(xiii)    440 Audobon Avenue, New York, New York;

(xiv)    535 Utica Avenue, Brooklyn, New York;

(xv)     550 West Merrick Road, Valley Stream, New York;

(xvi)    552 East 180th Street, Bronx, New York;

(xvii)   615 Seneca Avenue, Ridgewood, New York;

(xviii)  79-90 Northern Boulevard, Queens, New York;

(xix)    81-06 Baxter Avenue, Elmhurst, New York;

(xx)     941 Burke Avenue, Bronx, New York; and

(xxi)    95 East Merrick Road, Valley Stream, New York.

145.    Though ostensibly organized to provide a range of healthcare services to Insureds at individual locations, these Clinics in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud.

146.    The Management Defendants obtained access to the Clinics for the Provider Defendants by paying kickbacks to the individuals and entities that owned and controlled the Clinics.

147.    The kickbacks were disguised as ostensibly legitimate fees to "lease" space or personnel from the Clinics. In fact, these were "pay-to-play" arrangements that caused the Clinics and their owners to provide access to Insureds and to refer the Insureds to the Provider Defendants for the Fraudulent Services without regard for the medical necessity of any of the Fraudulent Services.

148.    In exchange for these kickbacks, when an Insured visited one of the Clinics, he or she automatically was referred to one of the Provider Defendants for medically unnecessary treatment, regardless of individual symptoms or presentment by the patient.

149.   The referrals typically were made by a receptionist or some other non-medical personnel at the Clinics who simply directed or "steered" the Insureds to whichever Provider Defendant was active during that time period and present at that particular Clinic on that day.

## D.   The Defendants' Fraudulent Treatment and Billing Protocol

150.   Virtually all of the Insureds in the claims identified in Exhibits "1" – "5" whom the Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all. Concomitantly, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

151.   Even so, the Defendants purported to subject virtually every Insured to a medically unnecessary course of "treatment" that was provided pursuant to a predetermined, fraudulent protocol designed to maximize the billing that they could submit through the Provider Defendants to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

152.   The Defendants purported to provide their predetermined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

153.   Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

154.    No legitimate licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices.

155.    The Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because the Provider Defendants were not truly owned or controlled by the Nominal Owner Defendants, or any other licensed healthcare providers.

156.    Rather, the Provider Defendants were illegally owned and controlled by the Management Defendants, who were not licensed in any healthcare professions and whose focus was profit, not patient care.

## 1.    The Fraudulent Charges for Initial Examinations

157.    Upon receiving a referral pursuant to the kickbacks that the Management Defendants paid to the individuals and entities that owned and controlled the Clinics, the Defendants purported to provide virtually every Insured in the claims identified in Exhibits "1" – "5" with an initial examination.

158.    In keeping with the fact that the initial examinations were performed – to the extent that they were performed at all – pursuant to the kickbacks that the Management Defendants paid to the individuals and entities that owned and controlled the Clinics, the Defendants virtually always purported to provide the initial examinations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

159.    The initial examinations were performed as a "gateway" in order to provide Insureds with pre-determined, phony "diagnoses" to allow the Defendants to then provide the additional Fraudulent Services, including follow-up examinations, pain management injections, dry-needling, and physical therapy services.

160.    Parisien, Lacina, Monroe, Denobrega, and O'Brian  virtually always purported to personally perform the initial examinations in the claims identified in Exhibits "1" – "5".

161.    The Defendants virtually always billed the initial examinations to GEICO under CPT code 99244, typically resulting in a charge of $236.94 for each initial examination they purported to perform and/or provide, or CPT code 99203, typically resulting in a charge of $105.63 for each initial examination they purported to perform and/or provide.

162.    The charges for the initial examinations were fraudulent in that they misrepresented the Provider Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance. In fact, the Provider Defendants never were eligible to bill for or to collect No-Fault Benefits, because they were unlawfully owned and controlled by the Management Defendants in contravention of New York law.

163.    The charges for the initial examinations also were fraudulent in that the initial examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' illegal kickback scheme, not to treat or otherwise benefit the Insureds.

164.    Furthermore, the charges for the initial examinations were fraudulent in that they misrepresented the extent and nature of the initial examinations.

a.    **The Fraudulent Misrepresentations of Examinations as "Consultations"**

165.    In every claim identified in Exhibits "1" – "5" for initial examinations under CPT code 99244, the Defendants falsely represented that they performed and/or provided a "consultation", as opposed to an ordinary patient examination.

166.    According to the Fee Schedule, the use of CPT code 99244 to bill for a patient examination represents that a physician or nurse practitioner has performed a "consultation" at the request of another physician or other appropriate source.

167.    The Defendants did not provide their initial examinations – to the extent that they were provided at all – at the request of any other physicians or other appropriate sources. Rather, to the extent that the initial examinations were performed in the first instance, they were performed solely as part of the Defendants' fraudulent treatment protocol, pursuant to the kickbacks that the Management Defendants paid to the individuals and entities that owned and controlled the Clinics.

168.    Furthermore, pursuant to the Fee Schedule, the use of CPT code 99244 represents that the physician or nurse practitioner who purportedly conducted the consultation submitted a written consultation report to the physician or other appropriate source who purportedly requested the consultation in the first instance.

169.    Though the Defendants routinely billed for the initial examinations under CPT code 99244, the physicians and nurse practitioners who purportedly conducted the examinations – virtually always either Parisien, Lacina, Monroe, Denobrega, and O'Brian – never submitted any written consultation report to any physician or other referring healthcare provider, because the initial examinations were not conducted at the request of any referring physician or healthcare provider.

170.   Moreover, pursuant to the American Medical Association's CPT Assistant (the "CPT Assistant"), which is incorporated by reference into the Fee Schedule, a patient examination that is conducted as the result of a referral – or the transfer of total or specific care to a healthcare services provider – does not constitute a "consultation".

171.   Though the Defendants routinely billed for the initial examinations in the claims identified in Exhibits "1" – "5" as "consultations" under CPT code 99244, all of the examinations in the claims identified in Exhibits "1" – "5" were the product of referrals, whereby pain management treatment of the Insureds supposedly was transferred to the Defendants.

172.   The Defendants frequently misrepresented their initial examinations to be consultations billable under CPT codes 99244 because such consultations are reimbursable under the Fee Schedule at a higher rate than commensurate, ordinary patient examinations.

b.   **The Fraudulent Misrepresentations of the Time Spent on the Initial Examinations**

173.   Moreover, the use of CPT code 99244 to bill for a patient examination typically represents that the physician or nurse practitioner who performed the examination spent at least 60 minutes of face-to-face time with the Insured or the Insured's family during the examination.

174.   Similarly, the use of CPT code 99203 to bill for a patient examination typically represents that the physician or nurse practitioner who performed the examination spent at least 30 minutes of face-to-face time with the Insured or the Insured's family during the examination.

175.   Though the Defendants virtually always billed for their putative initial examinations in the claims identified in Exhibits "1" – "5" under CPT codes 99244 and 99203, neither Parisien, Lacina, Monroe, Denobrega, O'Brian, nor any other physician or nurse practitioner associated with the Provider Defendants, ever spent 30 minutes of face-to-face time with the Insureds or their families during the initial examinations, much less 60 minutes. Rather,

the initial examinations rarely lasted more than 10-15 minutes, to the extent that they were conducted at all.

176. In keeping with the fact that the initial examinations rarely lasted more than 10-15 minutes, to the extent that they were conducted at all, Parisien, Lacina, Monroe, Denobrega, and O'Brian used boilerplate checklist forms in documenting the initial examinations, setting forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

177. All that was required to complete the boilerplate forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

178. These interviews and examinations did not require any physician or nurse practitioner associated with the Provider Defendants to spend more than 10-15 minutes of face-to-face time with the Insureds, let alone 30 or 60 minutes.

179. What is more, and in keeping with the fact that the Provider Defendants were all unlawfully owned and controlled by the Management Defendants – despite purporting to be five separate, independent medical practices owned by three separate licensed physicians – Parisien, Lacina, Monroe, Denobrega, and O'Brian all utilized the same boilerplate checklist forms in purporting to conduct the examinations on behalf of the Provider Defendants. It is improbable, to the point of impossibility, that Parisien, Lacina, Monroe, Denobrega, O'Brian, and the Provider Defendants – which ostensibly were owned by three separate licensed physicians – would coincidentally "just happen" to use the exact same boilerplate checklist forms in purporting to perform and/or provide initial examinations.

180.    In the claims for initial examinations identified in Exhibits "1" – "5", the Defendants routinely falsely represented that the examinations involved 30 or 60 minutes of face-to-face time between the examining physicians and the Insureds or the Insureds' families in order to create a false basis to bill for the examinations under CPT codes 99203 or 99244, because examinations billable under CPT codes 99203 and 99244 are reimbursable at higher rates than examinations that require less time to perform.

c.    **The Fraudulent Misrepresentations Regarding the Performance of "Comprehensive" or "Detailed" Physical Examinations**

181.    In addition, pursuant to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99244, or caused them to be submitted, they falsely represented that a physician or nurse practitioner associated with one of the Provider Defendants conducted a "comprehensive" physical examination.

182.    Similarly, pursuant to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99203, or caused them to be submitted, they falsely represented that a physician or nurse practitioner associated with one of the Provider Defendants conducted a "detailed" physical examination.

183.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician or nurse practitioner either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

184.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or nurse practitioner has not conducted a general examination of multiple patient organ systems unless the examining physician has documented findings with respect to at least eight organ systems.

185.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or nurse practitioner has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to:

(i)     at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)     examination of gait and station;

(vi)    examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)  coordination, deep tendon reflexes, and sensation; and

(ix)    mental status, including orientation to time, place and person, as well as mood and affect.

186.    In the claims identified in Exhibits "1" – "5", when the Defendants billed for the initial examinations under CPT codes 99244, they falsely represented that physicians or nurse practitioners associated with the Provider Defendants – virtually always Parisien, Lacina, Monroe, Denobrega, or O'Brian – conducted "comprehensive" patient examinations of the Insureds they purported to treat during the initial examinations.

187.   In fact, with respect to the claims identified in Exhibits "1" – "5", neither Parisien, Lacina, Monroe, Denobrega, O'Brian, nor any other physician or nurse practitioner associated with the Provider Defendants, ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

188.   For instance, in each of the claims under CPT code 99244 identified in Exhibits "1" – "5", neither Parisien, Lacina, Monroe, Denobrega, O'Brian, nor any other physician or nurse practitioner associated with the Provider Defendants, ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

189.   Furthermore, although the Defendants often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems in the claims for initial examinations identified in Exhibits "1" – "5", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)   at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)   the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)   examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)   examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and/or

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

190.   Pursuant to the Fee Schedule, a "detailed" physical examination requires – among other things – that the examining physician conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

191.   To the extent that the Insureds in the claims identified in Exhibits "1" – "5" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to musculoskeletal complaints.

192.   Pursuant to the CPT Assistant, in the context of patient examinations, a physician or nurse practitioner has not conducted a detailed examination of a patient's musculoskeletal organ system unless the physician or nurse practitioner has documented findings with respect to the following:

(i)   measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)   general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)   palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)   brief assessment of mental status;

(vi)   examination of gait and station;

   (vii)    inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

   (viii)   coordination;

   (ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

   (x)    examination of sensation.

193.    In the claims for initial examinations in Exhibits "1" – "5" in which the Defendants billed for the initial examinations under CPT code 99203, the Defendants falsely represented that Parisien, Lacina, Monroe, Denobrega, or O'Brian conducted a "detailed" patient examination of the Insureds they purported to treat during the initial examinations.

194.    For example, neither Parisien, Lacina, Monroe, Denobrega, O'Brian, nor any other physician or nurse practitioner associated with the Provider Defendants, even conducted a "detailed" patient examination of Insureds, inasmuch as they did not conduct an extended examination of the affected body areas and other symptomatic or related organ systems.

195.    Specifically, in the claims for initial examinations identified in Exhibits "1" – "5", neither Parisien, Lacina, Monroe, Denobrega, O'Brian, nor any other physician or nurse practitioner associated with the Provider Defendants, ever documented findings with respect to:

   (i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

   (ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

   (iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

   (iv)   palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)  brief assessment of mental status;

(vi)  examination of gait and station;

(vii)  inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)  examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)  examination of sensation.

196.  In the claims for initial examinations under CPT codes 99244 and 99203 that are identified in Exhibits "1" – "5", the Defendants falsely represented that they had provided "comprehensive" or "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations, because examinations billable under CPT codes 99244 and 99203 are reimbursable at higher rates than examinations that do not require the examining physician to provide "comprehensive" or "detailed" physical examinations.

**d.  The Fraudulent Misrepresentations Regarding "Moderate Complexity" or "Low Complexity" Medical Decision-Making**

197.  Moreover, pursuant to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99244, or caused them to be submitted, they falsely represented that a physician or nurse practitioner associated with one of the Provider Defendants – virtually always Parisien, Lacina, Monroe, Denobrega, or O'Brian – engaged in "moderately complex" medical decision-making.

198.  Similarly, pursuant to the Fee Schedule, when the Defendants submitted charges for initial examinations under CPT code 99203, or caused them to be submitted, they falsely represented that a physician or nurse practitioner associated with one of the Provider Defendants

– virtually always Parisien, Lacina, Monroe, Denobrega, or O'Brian – engaged in "low complexity" medical decision-making.

199. Pursuant to the Fee Schedule, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

200. The CPT Assistant provides various clinical examples of the types of presenting problems that require the kind of moderately complex medical decision-making necessary to support a charge under CPT code 99244, specifically:

(i) Office consultation with 38-year-old female, with inflammatory bowel disease, who now presents with right lower quadrant pain and suspected intra-abdominal abscess. (MC and Rectal Surgery)

(ii) Initial office consultation for discussion of treatment options for a 40-year-old female with a two-centimeter adenocarcinoma of the breast. (Radiation Oncology)

(iii) Initial office consultation with 72-year-old male with esophageal carcinoma, symptoms of dysphagia and reflux.

201. Thus, the sort of presenting problems that require the kind of moderately complex medical decision-making necessary to support a charge under CPT code 99244 typically are problems that pose a serious threat to the patient's health, or even the patient's life.

202. Similarly, the CPT Assistant provides various clinical examples of the types of presenting problems that require the kind of low complexity medical decision-making necessary to support a charge under CPT code 99203, specifically:

(i) Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

44

(ii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

203.    Thus, pursuant to the CPT Assistant, the sort of presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

204.    By contrast, to the limited extent that the Insureds in the claims identified in Exhibits "1" – "5" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains at the outset.

205.    What is more, by the time the Insureds in the claims identified in Exhibit "1" – "5" presented to the Provider Defendants for the putative initial examinations – typically weeks or even months after their accidents – the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents, or their presenting problems were of minimal severity.

206.    Though the Defendants routinely falsely represented that their initial examinations involved medical decision-making of "moderate complexity" when billed under

CPT code 99244, or "low complexity" when billed under CPT code 99203, in actuality the initial examinations did not involve any medical decision-making at all.

207.    First, the initial examinations did not involve the retrieval, review, or analysis of any medical records, diagnostic tests, or other information. When the Insureds presented to the Provider Defendants for "treatment" pursuant to the Defendants' illegal kickback scheme, they did not arrive with any medical records. Furthermore, prior to the initial examinations, the Defendants neither requested any medical records from any other providers, nor conducted any diagnostic tests.

208.    Second, there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

209.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by the Defendants, to the extent that the Defendants provided any such diagnostic procedures or treatment options in the first instance.

210.    In almost every instance, any diagnostic procedures and "treatments" that the Defendants actually provided were limited to a series of medically unnecessary pain management modalities and diagnostic tests, none of which was health- or life-threatening if properly administered.

211.    Third, neither Parisien, Lacina, Monroe, Denobrega, O'Brian, nor any other physician or nurse practitioner associated with the Provider Defendants, ever considered any significant number of diagnoses or treatment options for Insureds during the initial examinations.

212.    Rather, to the extent that the initial examinations were conducted in the first instance, the Defendants provided a nearly identical, pre-determined set of "diagnoses" for the Insureds, and prescribed a similar course of treatment for each Insured.

213.    Specifically, in almost every instance, during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

214.    Even so, the Defendants prepared phony initial examination/consultation reports in which they provided boilerplate headache, back pain, muscle pain, sprain/strain, and/or radiculitis diagnoses to virtually every Insured.

215.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

216.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

217.    As set forth above, in the claims identified in Exhibits "1" – "5", virtually all of the Insureds whom the Provider Defendants purported to treat were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

218.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "5" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

219.    It is even more improbable – to the point of impossibility – that this would occur repeatedly, often with the Insureds presenting at the Provider Defendants with substantially

identical injuries <u>on the exact same dates</u> weeks, or even months, after their accidents.

220.   Even so, in keeping with the fact that the Defendants' putative "diagnoses" were phony, in keeping with the fact that the putative initial examinations involved no actual medical decision-making at all, and in keeping with the fact that the Defendants' initial examinations were provided pursuant to the kickbacks that the Management Defendants paid to the Clinics, rather than medical necessity, Parisien, Lacina, and Monroe – at the direction of the Management Defendants – frequently issued substantially identical phony "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

221.   For example:

(i)   On January 11, 2016, two Insureds – CD and NS– were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 440 Audobon Avenue, New York, New York, CD and NS presented – incredibly – <u>on the exact same date more than six months later</u>, July 18, 2016, to HKM Medical for initial examinations by Monroe. CD and NS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that CD and NS suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Monroe – at the direction of the Management Defendants – provided CD and NS with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ii)   On May 16, 2016, two Insureds – GQ and LQ – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 79-90 Northern Boulevard, Queens, New York, GQ and LQ presented – incredibly – <u>on the exact same date almost three months later</u>, August 5, 2016, to HKM Medical for initial examinations by Monroe. GQ and LQ were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that GQ and LQ suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Monroe – at the direction of the Management Defendants – provided GQ and LQ with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iii)    On May 26, 2016, two Insureds – RI and ML – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 440 Audobon Avenue, New York, New York, RI and ML presented – incredibly – <u>on the exact same date</u>, May 31, 2016, to HKM Medical for initial examinations by Monroe. RI and ML were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that RI and ML suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Monroe – at the direction of the Management Defendants – provided RI and ML with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(iv)    On June 10, 2016, two Insureds – JA and ZT – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 79-90 Northern Boulevard, Queens, New York, JA and ZT presented – incredibly – <u>on the exact same date almost five months later</u>, November 4, 2016, to JPF Medical for initial examinations by Parisien. JA and ZT were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that JA and ZT suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Parisien – at the direction of the Management Defendants – provided JA and ZT with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(v)    On June 19, 2016, two Insureds – BB and PB – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 2430 Davidson Avenue, Bronx, New York, BB and PB presented – incredibly – <u>on the exact same date</u>, June 23, 2016, to HKM Medical for initial examinations by Monroe. BB and PB were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that BB and PB suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Monroe – at the direction of the Management Defendants – provided BB and PB with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vi)    On July 9, 2016, two Insureds – SM and CN – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 3407 White Plains Road, Bronx, New York, SM and CN presented – incredibly – <u>on the exact same date more than a month later</u>, August 16, 2016, to HKM Medical for initial examinations by Monroe. SM and CN were different ages, in different physical condition, and experienced the

minor impact from different locations in the vehicle. To the extent that SM and CN suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Monroe – at the direction of the Management Defendants – provided SM and CN with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(vii)   On July 11, 2016, two Insureds – DN and HN – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 1552 Ralph Avenue, Brooklyn, New York, DN and HN presented – incredibly – on the exact same date a month and a half later, August 24, 2016, to FJL Medical for initial examinations by Lacina. DN and HN were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that DN and HN suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Lacina – at the direction of the Management Defendants – provided DN and HN with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(viii)  On July 21, 2016, two Insureds –CN and MN – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 552 East 180th Street, Bronx, New York, CN and MN presented – incredibly – on the exact same date two and a half months later, October 6, 2016, to JPF Medical for initial examinations by Denobrega. CN and MN were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that CN and MN suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Denobrega – at the direction of the Management Defendants – provided CN and MN with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(ix)    On August 31, 2016, two Insureds – LP and  JR– were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 3209 Fulton Street, Brooklyn, New York, LP and  JR presented – incredibly – on the exact same date, September 21, 2016, to JFL Medical for initial examinations by Lacina. LP and  JR were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that LP and JR suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Lacina – at the direction of the Management Defendants – provided LP and  JR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(x)    On September 2, 2016, two Insureds – RB and LM – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 3250 Westchester Avenue, Bronx, New York, RB and LM presented – incredibly – on the exact same date, September 6, 2016, to PFJ Medical for initial examinations by Parisien. RB and LM were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that RB and LM suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Parisien – at the direction of the Management Defendants – provided RB and LM with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xi)    On September 6, 2016, two Insureds – AA and SA – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 3407 White Plains Road, Bronx, New York, AA and SA presented – incredibly – on the exact same date, September 13, 2016, to PFJ Medical for initial examinations by Parisien. AA and SA were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that AA and SA suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Parisien – at the direction of the Management Defendants – provided AA and SA with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xii)    On September 19, 2016, two Insureds –BB and DP – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 1552 Ralph Avenue, Brooklyn, New York, BB and DP presented – incredibly – on the exact same date, October 4, 2016, to JFL Medical for initial examinations by Lacina. BB and DP were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that BB and DP suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Lacina – at the direction of the Management Defendants – provided BB and DP with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xiii)    On October 25, 2016, two Insureds – LO and KR – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 3209 Fulton Street, Brooklyn, New York, LO and KR presented – incredibly – on the exact same date, November 10, 2016, to JFL Medical for initial examinations by Lacina. LO and KR were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that LO and KR suffered any

injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Lacina – at the direction of the Management Defendants – provided LO and KR with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xiv)   On December 10, 2016, two Insureds – QJ and TJ – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 941 Burke Avenue, Bronx, New York, QJ and TJ presented – incredibly – <u>on the exact same date</u>, January 26, 2017, to JPF Medical for initial examinations by Denobrega. QJ and TJ were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that QJ and TJ suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Denobrega – at the direction of the Management Defendants – provided QJ and TJ with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xv)    On January 1, 2017, two Insureds – JS and CS – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 1786 Flatbush Avenue, Brooklyn, New York, JS and CS presented – incredibly – <u>on the exact same date</u>, January 25, 2017, to JFL Medical for initial examinations by Lacina. JS and CS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that JS and CS suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Lacina – at the direction of the Management Defendants – provided JS and CS with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xvi)   On January 2, 2017, <u>three</u> Insureds – JC, PC, and DG – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 1552 Ralph Avenue, Brooklyn, New York, JC and PC presented – incredibly – <u>on the exact same date</u>, January 10, 2017, to JFL Medical for initial examinations by Lacina. Thereafter, on January 19, 2017, DG also presented to JFL Medical for an initial examination by Lacina, pursuant to the kickbacks that the Management Defendants paid to the 1552 Ralph Avenue Clinic. JC, PC, and DG were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that JC, PC, and DG suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Lacina – at the direction of the Management Defendants – provided JC, PC, and DG with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically

unnecessary "treatment" for all three of them.

(xvii) On January 6, 2017, two Insureds – DC and BH – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 941 Burke Avenue, Bronx, New York, DC and BH presented – incredibly – <u>on the exact same date</u>, January 19, 2017, to JPF Medical for initial examinations by Denobrega. DC and BH were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that DC and BH suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Denobrega – at the direction of the Management Defendants – provided DC and BH with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xviii) On January 13, 2017, two Insureds – DC and SP – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 95 East Merrick Road, Valley Stream, New York, DC and SP presented – incredibly – <u>on the exact same date</u>, January 24, 2017, to JPF Medical for initial examinations by Parisien. DC and SP were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that DC and SP suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Parisien – at the direction of the Management Defendants – provided DC and SP with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xix) On February 2, 2017, two Insureds – RF and GS – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 95 East Merrick Road, Valley Stream, New York, RF and GS presented – incredibly – <u>on the exact same date more than a month later</u>, March 7, 2017, to JPF Medical for initial examinations by Parisien. RF and GS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that RF and GS suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Parisien – at the direction of the Management Defendants – provided RF and GS with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xx) On February 6, 2017, two Insureds – RD and MV – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 3250 Westchester Avenue, Bronx, New York, RD and MV presented – incredibly – <u>on the exact same date</u>, February

16, 2017, to JPF Medical for initial examinations by Parisien. RD and MV were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that RD and MV suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Parisien – at the direction of the Management Defendants – provided RD and MV with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

(xxi)   On March 19, 2017, three Insureds – JM, RP, and TW – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 1786 Flatbush Avenue, Brooklyn, New York, JM and TW presented – incredibly – on the exact same date, March 21, 2017, to JPF Medical for initial examinations by O'Brian. Two days later, RP likewise presented to JPF Medical for an initial examination by O'Brian. JM, RP, and TW were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that JM, RP, and TW suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, O'Brian – at the direction of the Management Defendants – provided JM, RP, and TW with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for all three of them.

(xxii)  On April 7, 2017, two Insureds – OS and KS – were involved in the same minor automobile accident. Pursuant to the kickbacks that the Management Defendants paid to the owners of the Clinic at 1786 Flatbush Avenue, Brooklyn, New York, JS and CS presented – incredibly – on the exact same date, April 12, 2017, to JFL Medical for initial examinations by Lacina. OS and KS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that OS and KS l suffered any injuries at all in their minor accident, the injuries were different. Even so, at the conclusion of the putative initial examinations, Lacina – at the direction of the Management Defendants – provided OS and KS with substantially identical, phony "diagnoses", and recommended a substantially identical course of medically unnecessary "treatment" for both of them.

222.   These are only representative examples. In the claims for initial examinations that are identified in Exhibits "1" – "5", Parisien, Lacina, Monroe, Denobrega, and O'Brian – at the direction of the Management Defendants – frequently issued substantially identical "diagnoses", on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds, despite the

fact that the Insureds were differently situated.

223.    Parisien, Lacina, Monroe, Denobrega, and O'Brian routinely inserted these false "diagnoses" in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

224.    In the claims for initial examinations identified in Exhibits "1" – "5", the Defendants routinely falsely represented that the initial examinations involved "moderate complexity" or "low complexity" medical decision-making in order to provide a false basis to bill for the initial examinations under CPT codes 99244 and 99203, because examinations billable under CPT codes 99244 and 99203 are reimbursable at a higher rate than examinations that do not require any complex medical decision-making at all.

**2.    The Fraudulent Charges for Follow-Up Examinations**

225.    In addition to the fraudulent initial examinations, the Defendants typically purported to subject Insureds to one or more fraudulent follow-up examinations during the course of their fraudulent treatment protocol.

226.    In keeping with the fact that the follow-up examinations were performed – to the extent that they were performed at all – pursuant to the kickbacks that the Management Defendants paid to the individuals and entities that owned and controlled the Clinics, the Defendants virtually always purported to provide the follow-up examinations at the Clinics where they obtained their initial referrals, rather than at any stand-alone practice.

227.    Parisien, Lacina, Monroe, or Denobrega virtually always purported to personally perform the follow-up examinations in the claims identified in Exhibits "1" – "5".

228.    The Defendants virtually always billed the follow-up examinations to GEICO under CPT code 99215, typically resulting in a charge of $148.69 for each follow-up examination they purported to perform and/or provide, or CPT code 99213, typically resulting in a charge of $70.36 for each initial examination they purported to perform and/or provide.

229.    The charges for the follow-up examinations were fraudulent in that they misrepresented the Provider Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance. In fact, the Provider Defendants never were eligible to bill for or to collect No-Fault Benefits, because they were unlawfully owned and controlled by the Management Defendants in contravention of New York law.

230.    The charges for the follow-up examinations also were fraudulent in that the initial examinations were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' illegal kickback scheme, not to treat or otherwise benefit the Insureds.

231.    Furthermore, the charges for the follow-up examinations were fraudulent in that they misrepresented the extent and nature of the follow-up examinations.

232.    Pursuant to the Fee Schedule, the use of CPT code 99215 to bill for a follow-up examination typically represents that the Insured presented with problems of moderate-to-high severity.

233.    The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of moderate-to-high severity, and thereby justify the use of CPT code 99215 to bill for a follow-up patient examination. Specifically:

(i)     Office visit with 30-year-old male, established patient 3 month history of fatigue, weight loss, intermittent fever, and presenting with diffuse adenopathy and splenomegaly. (Family Medicine)

(ii)   Office evaluation and discussion of treatment options for a 68-year-old male with a biopsy-proven rectal carcinoma. (General Surgery)

(iii)   Office visit for restaging of an established patient with new lymphadenopathy one year post therapy for lymphoma. (Hematology/Oncology)

(iv)   Follow-up office visit for a 65-year-old male with a fever of recent onset while on outpatient antibiotic therapy for endocarditis. (Infectious Disease)

(v)   Office visit for evaluation of recent onset syncopal attacks in a 70-year-old woman, established patient (Internal Medicine)

(vi)   Follow-up office visit for a 75-year-old patient with ALS (amyotropfuc lateral sclerosis), who is no longer able to swallow. (Neurology)

(vii)   Follow-up visit, 40-year-old mother of 3, with acute rheumatoid arthritis, anatomical Stage 3, ARA function Class 3 rheumatoid arthritis, and deteriorating function. (Rheumatology)

234.   Thus, the sort of presenting problems that justify a charge under CPT code 99215 typically are problems that pose a serious threat to the patient's health, or even the patient's life.

235.   Pursuant to the Fee Schedule, the use of CPT code 99213 to bill for a follow-up examination typically represents that the Insured presented with problems of low-to-moderate severity.

236.   The CPT Assistant provides various clinical examples of the types of presenting problems that might qualify as problems of low-to-moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination. Specifically:

(i)   Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

(ii)   Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

(iii)   Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

(iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

(v)    Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

(vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

(vii)    Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

237.    Accordingly, pursuant to the CPT Assistant, even the low-to-moderate severity presenting problems that could support the use of CPT code 99213 to bill for a follow-up patient examination typically are problems that pose some real threat to the patient's health.

238.    Though the Defendants virtually always billed for their putative follow-up examinations using CPT codes 99213 or 99215 – and thereby represented that the Insureds in the claims identified in Exhibits "1" – "5" presented with problems of either low-to-moderate severity or moderate-to-high severity during the follow-up examinations, in fact the Insureds either had no presenting problems at all during the follow-up examinations, or else their presenting problems were trivial.

239.    For instance, and as set forth above, in virtually every case the Insureds who presented to the Provider Defendants for treatment were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

240.    To the limited extent that the Insureds were treated at any hospital following their accidents, they virtually always briefly were observed on an outpatient basis and then sent on their way after an hour or two with – at most – a minor sprain or strain diagnosis.

241.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all.

242.    Accordingly, by the time the Insureds in the claims identified in Exhibits "1" – "5" presented to the Provider Defendants for follow-up examinations – typically weeks or months after their minor accidents – they either had no continuing injuries at all as the result of their minor accidents, or their presenting problems were minimal.

243.    In the claims for follow-up examinations identified in Exhibits "1" – "5", the Defendants falsely represented that the Insureds presented with problems of low-to-moderate severity (when billed under CPT code 99213) or moderate-to-high severity (when billed under CPT code 99215) in order to create a false basis for their charges under CPT codes 99213 and 99215, because follow-up examinations billable under CPT codes 99213 and 99215 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

244.    In the claims for follow-up examinations identified in Exhibits "1" – "5", the Defendants also falsely represented that the Insureds presented with problems of low-to-moderate severity  or moderate-to-high severity in order to create the false appearance that the Insureds continued to suffer from injuries sustained in automobile accidents, and thereby create a false basis for the other Fraudulent Services the Defendants purported to provide, including medically-unnecessary trigger point and "dry needling" injections.

245.    What is more, and pursuant to the Fee Schedule, the use of CPT code 99215 to bill for a follow-up patient examination typically requires that the examining physician or nurse practitioner spend at least 40 minutes of face-to-face time with the Insured or the Insured's family during the examination.

246.    Pursuant to the Fee Schedule, the use of CPT code 99213 to bill for a follow-up patient examination typically requires that the examining physician or nurse practitioner spend at

least 15 minutes of face-to-face time with the Insured or the Insured's family during the examination.

247. Though the Defendants billed for their putative follow-up examinations using CPT codes 99215 and 99213, neither Parisien, Lacina, Monroe, Denobrega, nor any other physician or nurse practitioner associated with the Provider Defendants ever spent even 15 minutes of face-to-face time with the Insureds or their families in the claims identified in Exhibits "1" – "5", much less 40 minutes.

248. Rather, the follow-up examinations in the claims identified in Exhibits "1" – "5" rarely lasted more than 10 minutes, to the extent that they were conducted at all.

249. In keeping with the fact that the follow-up examinations in the claims identified in Exhibits "1" – "5" rarely lasted more than 10 minutes, to the extent that they were conducted at all, Parisien, Lacina, Monroe, and Denobrega used boilerplate checklist forms in documenting the follow-up examinations, setting forth a very limited range of potential patient complaints, examination/diagnostic testing options, potential diagnoses, and treatment recommendations.

250. All that was required to complete the boilerplate forms was a brief patient interview and a brief physical examination of the Insureds, consisting of a check of some of the Insureds' vital signs, basic range of motion and muscle strength testing, and basic neurological testing.

251. These interviews and examinations did not require any physician or nurse practitioner associated with the Provider Defendants to spend more than 10 minutes of face-to-face time with the Insureds or their families, let alone 15 or 40 minutes.

252. What is more, and in keeping with the fact that the Provider Defendants were all unlawfully owned and controlled by the Management Defendants – despite purporting to be five

separate, independent medical practices owned by three separate licensed physicians – Parisien, Lacina, Monroe, and Denobrega all utilized the same boilerplate checklist forms in purporting to conduct the follow-up examinations on behalf of the Provider Defendants. It is improbable, to the point of impossibility, that Parisien, Lacina, Monroe, Denobrega, and the Provider Defendants – which ostensibly were owned by three separate licensed physicians – would coincidentally "just happen" to use the exact same boilerplate checklist forms in purporting to perform and/or provide follow-up examinations.

253.    In the claims for follow-up examinations identified in Exhibits "1" – "5", the Defendants routinely falsely represented that the examinations involved 15 or 40 minutes of face-to-face time between the examining physicians and the Insureds or the Insureds' families in order to create a false basis to bill for the examinations under CPT codes 99213 or 99215, because follow-up examinations billable under CPT codes 99213 and 99215 are reimbursable at higher rates than examinations that require less time to perform.

254.    Furthermore, and pursuant to the Fee Schedule, when the Defendants billed for their putative follow-up examinations under CPT code 99215, they represented that Parisien, Lacina, Monroe, and Denobrega performed at least two of the following three components: (i) took a "comprehensive" patient history; (ii) conducted a "comprehensive" physical examination; and (iii) engaged in medical decision-making of "high complexity".

255.    Similarly, pursuant to the Fee Schedule, when the Defendants billed for their putative follow-up examinations under CPT code 99213, they represented that Parisien, Lacina, Monroe, and Denobrega performed at least two of the following three components:  (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused" physical examination; and (iii) engaged in medical decision-making of "low complexity".

256.    In actuality, however, in the claims for follow-up examinations identified in Exhibits "1" – "5", neither Parisien, Lacina, Monroe, Denobrega, nor any other physician or nurse practitioner associated with the Provider Defendants took any legitimate patient histories, conducted any legitimate physical examinations, or engaged in any legitimate medical decision-making at all.

257.    Rather, following their purported follow-up examinations, and at the direction of the Management Defendants, Parisien, Lacina, Monroe, and Denobrega simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; and (ii) referred the Insureds back to the Provider Defendants for medically-unnecessary trigger point and/or "dry needling" injections.

258.    As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

259.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

260.    What is more, even in the unlikely event that two Insureds suffered substantially identical injuries in a single automobile accident, their individual characteristics would determine whether, how, and to what extent their respective injuries resolved over time.

261.    It is improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibits "1" – "5" would suffer substantially identical injuries that continued to manifest themselves, in the same way, during contemporaneous follow-up examinations many weeks or even months after the underlying accidents.

262.    It is even more improbable – to the point of impossibility – that this would happen over and over again.

263.    Even so, in keeping with the fact that the Defendants' putative follow-up examinations were phony, Parisien, Lacina, Monroe, and Denobrega – at the direction of the Management Defendants – frequently falsely reported that two or more Insureds who were involved in the same underlying accident suffered substantially identical injuries that continued to manifest themselves, in the same way, during contemporaneous follow-up examinations weeks or even months after the underlying accidents.

264.    For example:

(i)    On March 26, 2016, two Insureds – AP and JM – were involved in the same minor automobile accident. AP and JM were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that AP and JM suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of AP and JM at HKM Medical on September 13, 2016, Monroe – at the direction of the Management Defendants – provided AP and JM with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(ii)    On May 21, 2016, two Insureds – MG and DM – were involved in the same minor automobile accident. MG and DM were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that MG and DM suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of MG and DM at PFJ Medical on August 26, 2016, Parisien – at the direction of the Management Defendants – provided MG and DM with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(iii)    On May 31, 2016, two Insureds – JJ and TS – were involved in the same minor automobile accident. JJ and TS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that JJ and TS suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of JJ and TS at JFL Medical on December 9, 2016, Lacina – at the direction of the Management Defendants – provided JJ and TS with substantially identical, phony "diagnoses", despite the

fact that they were differently situated.

(iv)     On June 10, 2016, two Insureds – AM and MM – were involved in the same minor automobile accident. AM and MM were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that AM and MM suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of AM and MM at HKM Medical on September 7, 2016, Monroe – at the direction of the Management Defendants – provided AM and MM with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(v)      On June 19, 2016, two Insureds – BB and PB – were involved in the same minor automobile accident. BB and PB were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that BB and PB suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of BB and PB at HKM Medical on July 7, 2016, July 14, 2016, and July 28, 2016, Monroe – at the direction of the Management Defendants – provided BB and PB with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(vi)     On July 7, 2016, two Insureds – RC and TJ – were involved in the same minor automobile accident. RC and TJ were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that RC and TJ suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of TJ at HKM Medical on August 17, 2016, and RC at HKM Medical on August 24, 2016, Monroe – at the direction of the Management Defendants – provided RC and TJ with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(vii)    On July 11, 2016, two Insureds – DN and HN – were involved in the same minor automobile accident. DN and HN were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that DN and HN suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of DN and HN at FJL Medical on August 24, 2016, Lacina – at the direction of the Management Defendants – provided DN and HN with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(viii)   On July 16, 2016, two Insureds – FO and RO – were involved in the same minor automobile accident. FO and RO were different ages, in different physical condition, and experienced the minor impact from different locations in the

vehicle. To the extent that FO and RO suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of FO and RO at HKM Medical on August 10, 2016, Monroe – at the direction of the Management Defendants – provided FO and RO with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(ix)    On August 31, 2016, two Insureds – LP and JR – were involved in the same minor automobile accident. LP and JR were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that LP and JR suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of LP and JR at JFL Medical on October 12, 2016, Lacina – at the direction of the Management Defendants – provided LP and JR with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(x)    On September 15, 2016, two Insureds – GH and RL – were involved in the same minor automobile accident. GH and RL were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that GH and RL suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of GH and RL at JFL Medical on January 3, 2017, March 23, 2017, and April 27, 2017, Lacina – at the direction of the Management Defendants – provided GH and RL with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(xi)    On December 27, 2016, two Insureds – JB and MC  – were involved in the same minor automobile accident. JB and MC were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that JB and MC suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of JB and MC at JPF Medical on February 16, 2017 and April 7, 2017, Denobrega – at the direction of the Management Defendants – provided JB and MC with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(xii)    On January 6, 2017, two Insureds – DC and BH – were involved in the same minor automobile accident. DC and BH were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that DC and BH suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of DC and BH at JPF Medical on January 26, 2017 and February 16, 2017, Denobrega – at the direction of the Management Defendants – provided DC and BH with substantially

identical, phony "diagnoses", despite the fact that they were differently situated.

(xiii)   On February 2, 2017, two Insureds – RF and GS – were involved in the same minor automobile accident. RF and GS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that RF and GS suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of RF and GS at JPF Medical on April 25, 2017, Parisien – at the direction of the Management Defendants – provided RF and GS with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(xiv)   On February 18, 2017, two Insureds – DI and SI – were involved in the same minor automobile accident. DI and SI were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that DI and SI suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of DI and SI at JPF Medical on April 18, 2017, Parisien – at the direction of the Management Defendants – provided DI and SI with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

(xv)   On March 6, 2017, two Insureds – HR and NS – were involved in the same minor automobile accident. HR and NS were different ages, in different physical condition, and experienced the minor impact from different locations in the vehicle. To the extent that HR and NS suffered any injuries at all in their minor accident, their injuries were different, and resolved differently over time. Even so, at the conclusion of putative follow-up examinations of HR and NS at JPF Medical on April 13, 2017, Parisien – at the direction of the Management Defendants – provided HR and NS with substantially identical, phony "diagnoses", despite the fact that they were differently situated.

265.   These are only representative examples. In the claims for follow-up examinations that are identified in Exhibits "1" – "5", Parisien, Lacina, Monroe, and Denobrega – at the direction of the Management Defendants – frequently falsely reported that two or more Insureds who were involved in the same underlying accident suffered substantially identical injuries that continued to manifest themselves, in the same way, during contemporaneous follow-up examinations weeks or even months after the underlying accidents.

266.   Parisien, Lacina, Monroe, and Denobrega routinely inserted these false

"diagnoses" in their follow-up examination reports in order to create the false impression that the follow-up examinations actually were legitimately performed, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds.

**3.    The Fraudulent Charges for Trigger Point Injections**

267.    Based upon the fraudulent, pre-determined, and phony "diagnoses" that Parisien, Lacina, Monroe, Denobrega, and O'Brian provided during their ersatz initial and follow-up examinations, the Defendants purported to subject many Insureds in the claims identified in Exhibits "1" – "5" to a series of medically unnecessary trigger point injections.

268.    Parisien, Lacina, Monroe, Denobrega, and O'Brian virtually always purported to personally administer the trigger point injections, which the Defendants then billed through the Provider Defendants to GEICO under CPT codes 20552 or 20553, typically resulting in charges of between $100.00 and $119.10 for each round of trigger point injections they purported to perform and/or provide.

269.    Like the Defendants' charges for the other Fraudulent Services, the charges for the trigger point injections were fraudulent in that they misrepresented the Provider Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance. In fact, the Provider Defendants never were eligible to bill for or to collect No-Fault Benefits, because they were unlawfully owned and controlled by the Management Defendants in contravention of New York law.

270.    The charges for the trigger point injections also were fraudulent in that the trigger point injections were medically unnecessary and were performed – to the extent that they were

performed at all – pursuant to the Defendants' illegal kickback scheme, not to treat or otherwise benefit the Insureds.

**a.      Legitimate Use of Trigger Point Injections**

271.      Trigger points are irritable, painful, taut muscle bands or palpable knots in a muscle that can cause localized pain or referred pain that is felt in a part of the body other than that in which the applicable muscle is located. Trigger points can be caused by a variety of factors, including direct muscle injuries sustained in automobile accidents.

272.      Trigger point injections typically involve injections of local anesthetic medication into a trigger point. Trigger point injections can relax the area of intense muscle spasm, improve blood flow to the affected area, and thereby permit the washout of irritating metabolites.

273.      Any legitimate trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

274.      In a legitimate clinical setting, trigger point injections should not be administered until a patient has pain symptoms that have persisted for more than three months and has failed or been intolerant of conservative therapies for at least one month.

275.      This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of days or weeks through conservative treatment, and invasive pain management injections entail a degree of risk to the patient that is absent in more conservative forms of treatment.

**b.      The Defendants' Medically Unnecessary Trigger Point Injections**

276.      However, in the claims for trigger point injections that are identified in Exhibits "1" – "5", Parisien, Lacina, Monroe, Denobrega, and O'Brian – at the direction of the

Management Defendants – routinely purported to subject Insureds to trigger point injections within less than one month after the Insureds' underlying automobile accidents, and often within days after the accidents, long before the Insureds could have tried and failed any course of legitimate, conservative treatment.

277. For example:

(i)    On June 4, 2016, an Insured named EW was involved in an automobile accident. Though EW could not have experienced persistent pain symptoms or failed conservative treatments less than a month after her accident, Monroe and HKM Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to EW on June 29, 2016, less than a month after her accident.

(ii)   On July 11, 2016, an Insured named HN was involved in an automobile accident. Though HN could not have experienced persistent pain symptoms or failed conservative treatments less than a month after her accident, Monroe and HKM Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to HN on July 29, 2016, less than a month after her accident.

(iii)  On July 19, 2016, two Insureds named JC and SD were involved in the same automobile accident. Though JC and SD could not have experienced persistent pain symptoms or failed conservative treatments just one day after their accident, Monroe and HKM Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to JC and SD on July 20, 2016, just one day after their accident.

(iv)   On July 23, 2016, an Insured named EM was involved in an automobile accident. Though EM could not have experienced persistent pain symptoms or failed conservative treatments less than a week after her accident, Monroe and HKM Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to EM on July 27, 2016, less than a week after her accident.

(v)    On August 21, 2016, an Insured named PF was involved in an automobile accident. Though PF could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after her accident, Parisien and PFJ Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to PF on August 31, 2016, less than two weeks after her accident.

(vi)     On August 30, 2016, an Insured named VD was involved in an automobile accident. Though VD could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after his accident, Parisien and PFJ Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to VD on September 8, 2016, less than two weeks after his accident.

(vii)    On September 2, 2016, an Insured named RB was involved in an automobile accident. Though RB could not have experienced persistent pain symptoms or failed conservative treatments less than one week after his accident, Parisien and PFJ Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to RB on September 6, 2016, less than one week after his accident.

(viii)   On September 4, 2016, an Insured named KA was involved in an automobile accident. Though KA could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after her accident, Parisien and PFJ Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to KA on September 14, 2016, less than two weeks after her accident.

(ix)     On September 6, 2016, two Insured named AA and SA were involved in an automobile accident. Though AA and SA could not have experienced persistent pain symptoms or failed conservative treatments just one week after their accident, Parisien and PFJ Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to AA and SA on September 13, 2016, just one week after their accident.

(x)      On September 24, 2016, an Insured named FF was involved in an automobile accident. Though FF could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after his accident, Parisien and JPF Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to FF on October 5, 2016, less than two weeks after his accident.

(xi)     On September 26, 2016, an Insured named SC was involved in an automobile accident. Though SC could not have experienced persistent pain symptoms or failed conservative treatments less than a week after her accident, Monroe and HKM Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to SC on September 30, 2016, less than a week after her accident.

(xii)    On October 26, 2016, an Insured named DG was involved in an automobile accident. Though DG could not have experienced persistent pain symptoms or failed conservative treatments less than one week after her accident, Lacina and JFL Medical – at the direction of the Management Defendants – purported to

administer multiple trigger point injections to DG on November 2, 2016, less than one week after her accident.

(xiii)   On November 11, 2016, an Insured named TM was involved in an automobile accident. Though TM could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after his accident, Parisien and JPF Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to TM on November 23, 2016, less than two weeks after his accident.

(xiv)   On December 10, 2016, an Insured named QJ was involved in an automobile accident. Though QJ could not have experienced persistent pain symptoms or failed conservative treatments less than one week after his accident, Parisien and JPF Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to QJ on December 15, 2016, less than one week after his accident.

(xv)   On December 11, 2016, an Insured named MH was involved in an automobile accident. Though MH could not have experienced persistent pain symptoms or failed conservative treatments less than one week after his accident, Parisien and JPF Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to MH on December 15, 2016, less than one week after his accident.

(xvi)   On December 21, 2016, an Insured named CT was involved in an automobile accident. Though CT could not have experienced persistent pain symptoms or failed conservative treatments less than 10 days after his accident, Lacina and JFL Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to CT on December 29, 2016, less than 10 days after his accident.

(xvii)   On January 3, 2017, an Insured named LT was involved in an automobile accident. Though LT could not have experienced persistent pain symptoms or failed conservative treatments just two days after his accident, Denobrega and JPF Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to LT on January 5, 2017, just two days after his accident.

(xviii)   On February 28, 2017, an Insured named CN was involved in an automobile accident. Though CN could not have experienced persistent pain symptoms or failed conservative treatments just two days after his accident, Lacina and JFL Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to CN on March 2, 2017, just two days after his accident.

(xix)     On March 3, 2017, an Insured named CR was involved in an automobile accident. Though CR could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after her accident, Lacina and JFL Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to CR on March 16, 2017, less than two weeks after her accident.

(xx)      On March 9, 2017, an Insured named GM was involved in an automobile accident. Though GM could not have experienced persistent pain symptoms or failed conservative treatments less than 10 days after his accident, Denobrega and JPF Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to GM on March 16, 2017, less than 10 days after his accident.

(xxi)     On March 26, 2017, an Insured named SS was involved in an automobile accident. Though SS could not have experienced persistent pain symptoms or failed conservative treatments just two days after his accident, Parisien and JPF Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to SS on March 28, 2017, just two days after his accident.

(xxii)    On April 4, 2017, an Insured named JM was involved in an automobile accident. Though JM could not have experienced persistent pain symptoms or failed conservative treatments less than one month after his accident, Lacina and JFL Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to JM on May 2, 2017, less than one month after his accident.

(xxiii)   On April 18, 2017, an Insured named IS was involved in an automobile accident. Though IS could not have experienced persistent pain symptoms or failed conservative treatments less than three weeks after her accident, O'Brian and JPF Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to IS on May 4, 2017, less than three weeks after her accident.

(xxiv)    On April 25, 2017, an Insured named RD was involved in an automobile accident. Though RD could not have experienced persistent pain symptoms or failed conservative treatments just two days after his accident, O'Brian and JPF Medical – at the direction of the Management Defendants – purported to administer multiple trigger point injections to RD on April 27, 2017, just two days after his accident.

(xxv)     On May 1, 2017, an Insured named AA was involved in an automobile accident. Though AA could not have experienced persistent pain symptoms or failed conservative treatments just two days after his accident, O'Brian and JPF Medical – at the direction of the Management Defendants – purported to administer

multiple trigger point injections to AA on May 3, 2017, just two days after his accident.

278.    These are only representative examples. In the trigger point injection claims identified in Exhibits "1" – "5", the Defendants routinely purported to perform and/or provide medically unnecessary trigger point injections to Insureds within less than one month after the Insureds' underlying automobile accidents, and often within days after the accidents, long before the Insureds could have tried and failed any course of legitimate, conservative treatment.

279.    The Defendants engaged in this conduct solely in order to maximize the fraudulent billing they could submit, or cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to the injections.

280.    To further increase the fraudulent billing that they submitted for a medically-unnecessary trigger point session, the Defendants routinely submitted a separate charge of $262.91, under CPT code 76942, for "ultrasound guidance" of the trigger point injections.

281.    The charges for "ultrasound guidance" of the injections were fraudulent inasmuch as, like the underlying trigger point injection itself, the ultrasound guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to a pre-determined fraudulent protocol designed to maximize the Defendants' billing rather than to treat the Insureds who supposedly were subjected to it. Ultrasound guidance is not required to properly administer a trigger point injection.

282.    The Defendants purported to perform and/or provide these medically unnecessary trigger point injections because their focus was on generating profit, rather than on patient case, and because the Provider Defendants were operated pursuant to the pecuniary interests of the Management Defendants, rather than the legitimate medical judgment of true doctor-owners.

4.    **The Fraudulent Charges for "Dry Needling" Injections**

283.    Based upon the fraudulent, pre-determined, and phony "diagnoses" that Parisien, Lacina, Monroe, Denobrega, and O'Brian provided during their ersatz initial and follow-up examinations, the Defendants purported to subject many Insureds in the claims identified in Exhibits "1" – "5" to a series of medically unnecessary "dry needling" injections.

284.    Like their purported trigger point injections, the Defendants purported to perform and/or provide their putative dry needling injections in order to treat trigger points in the Insureds, although the Insureds in the claims identified in Exhibits "1" – "5" did not have any legitimate trigger point complaints, and did not require any trigger point treatments.

285.    Parisien, Lacina, Monroe, Denobrega, and O'Brian virtually always purported to personally administer the dry needling injections, which the Defendants then billed through the Provider Defendants to GEICO as multiple charges of either $100.00 or $75.00 per Insured, per date of service, under CPT code 20999, typically resulting in charges of thousands of dollars per Insured, per date of service, for each set of dry needling injections the Defendants purported to perform and/or provide.

286.    Like the Defendants' charges for the other Fraudulent Services, the charges for the dry needling injections were fraudulent in that they misrepresented the Provider Defendants' eligibility to bill for or to collect No-Fault Benefits in the first instance. In fact, the Provider Defendants never were eligible to bill for or to collect No-Fault Benefits, because they were unlawfully owned and controlled by the Management Defendants in contravention of New York law.

287.    In keeping with the fact that the Provider Defendants were unlawfully owned and controlled by the Management Defendants in contravention of New York law, the charges for

dry needling submitted through JPF Medical, PFJ Medical, FJL Medical, and JFL Medical virtually always violated the settlement agreement in the First Parisien Action.

288.     Specifically, and as set forth above, in August 2016 Parisien and Lacina entered into a settlement agreement in the First Parisien Action.

289.     Pursuant to the terms of the settlement agreement in the First Parisien Action, Parisien and Lacina agreed that neither they, nor any medical practice they owned, would bill GEICO for more than two dry needling treatments provided to any individual Insured within a 60 day period.

290.     Even so, in the claims for dry needling injections identified in Exhibits "1" – "4", JPF Medical, PFJ Medical, FJL Medical, and JFL Medical routinely billed GEICO dozens of individual charges for individual dry needling treatments provided to individual Insureds on individual dates of service.

291.     JPF Medical, PFJ Medical, FJL Medical, and JFL Medical routinely billed GEICO dozens of individual charges for individual dry needling treatments provided to individual Insureds on individual dates of service because they were secretly and unlawfully owned and controlled by the Management Defendants, who were not parties to the settlement agreement in the First Parisien Action, rather than by Parisien and Lacina, who were parties to the settlement agreement in the First Parisien Action.

292.     The charges for the dry needling injections also were fraudulent in that the dry needling injections were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Defendants' illegal kickback scheme, not to treat or otherwise benefit the Insureds who purportedly were subjected to them.

a.    **Legitimate Use of Dry Needling Injections**

293.    Dry needling is a technique in which a thin filiform needle is used to penetrate the skin and stimulate underlying myofascial trigger points, muscular, and connective tissues. The technique is used to treat dysfunctions in skeletal muscle, fascia, and connective tissue, diminish persistent peripheral nociceptive input, and reduce or restore impairments of body structure and function.

294.    As set forth above, any legitimate trigger point treatment should begin with conservative therapies such as bed rest, active exercises, physical therapy, heating or cooling modalities, massage, and basic, non-steroidal, anti-inflammatory analgesic, such as ibuprofen or naproxen sodium.

295.    In a legitimate clinical setting, dry needling injections – like any other type of pain management injections – should not be administered until a patient has pain symptoms that have persisted for more than three months and has failed or been intolerant of conservative therapies for at least one month.

296.    This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of days or weeks through conservative treatment, and invasive dry needling injections entail a degree of risk to the patient that is absent in more conservative forms of treatment.

297.    Moreover, in a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections – including trigger point injections and dry needling injections – should not be administered simultaneously.

298.    This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

**b.    The Defendants' Medically Unnecessary Dry Needling Injections**

299.    However, in the claims for dry needling injections that are identified in Exhibits "1" – "5", Parisien, Lacina, Monroe, Denobrega, and O'Brian – at the direction of the Management Defendants – routinely purported to subject Insureds to a massive amount of dry needling injections within less than one month after the Insureds' underlying automobile accidents, and often within days after the accidents, long before the Insureds could have tried and failed any course of legitimate, conservative treatment.

300.    What is more, in the claims for dry needling injections that are identified in Exhibits "1" – "5", Parisien, Lacina, Monroe, Denobrega, and O'Brian – at the direction of the Management Defendants – often purported to administer dry needling injections to Insureds on or about the same dates when they purported to administer trigger point injections to the Insureds, without waiting to determine whether the preceding type of injections was effective in treating the Insureds' purported pain symptoms.

301.    For example:

(i)    On May 26, 2016, an Insured named RI was involved in an automobile accident. Though RI could not have experienced persistent pain symptoms or failed conservative treatments less than a week after his accident, Monroe and HKM Medical – at the direction of the Management Defendants – simultaneously

purported to administer more than a dozen dry needling injections, as well as multiple trigger point injections, to RI on May 31, 2016, less than a week after his accident.

(ii)     On July 7, 2016, an Insured named RC was involved in an automobile accident. Though RC could not have experienced persistent pain symptoms or failed conservative treatments less than a week after his accident, Monroe and HKM Medical – at the direction of the Management Defendants – simultaneously purported to administer more than a dozen dry needling injections, as well as multiple trigger point injections, to RC on July 13, 2016, less than a week after his accident.

(iii)    On July 22, 2016, an Insured named TC was involved in an automobile accident. Though TC could not have experienced persistent pain symptoms or failed conservative treatments less than a week after his accident, Monroe and HKM Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 30 dry needling injections, as well as multiple trigger point injections, to TC on July 27, 2016, less than a week after his accident.

(iv)    On August 3, 2016, an Insured named JS was involved in an automobile accident. Though JS could not have experienced persistent pain symptoms or failed conservative treatments less than a week after his accident, Monroe and HKM Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 20 dry needling injections, as well as multiple trigger point injections, to JS on August 8, 2016, less than a week after his accident.

(v)     On August 3, 2016, an Insured named AS was involved in an automobile accident. Though AS could not have experienced persistent pain symptoms or failed conservative treatments less than a week after her accident, Monroe and HKM Medical – at the direction of the Management Defendants – simultaneously purported to administer more than a dozen dry needling injections, as well as multiple trigger point injections, to AS on August 8, 2016, less than a week after her accident.

(vi)    On August 26, 2016, an Insured named SM was involved in an automobile accident. Though SM could not have experienced persistent pain symptoms or failed conservative treatments less than one week after his accident, Parisien and PFJ Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 15 dry needling injections, as well as multiple trigger point injections, to SM on August 31, 2016, less than one week after his accident.

(vii)   On August 29, 2016, an Insured named JE was involved in an automobile accident. Though JE could not have experienced persistent pain symptoms or

failed conservative treatments just one week after her accident, Lacina and FJL Medical – at the direction of the Management Defendants – simultaneously purported to administer more than two dozen dry needling injections to JE on September 6, 2016, just one week after her accident.

(viii)    On September 4, 2016, an Insured named KA was involved in an automobile accident. Though KA could not have experienced persistent pain symptoms or failed conservative treatments just 10 days after her accident, Parisien and PFJ Medical – at the direction of the Management Defendants – simultaneously purported to administer more than three dozen dry needling injections, as well as multiple trigger point injections, to KA on September 14, 2016, just 10 days after her accident.

(ix)    On September 5, 2016, an Insured named AD was involved in an automobile accident. Though AD could not have experienced persistent pain symptoms or failed conservative treatments just two weeks after his accident, Lacina and FJL Medical – at the direction of the Management Defendants – simultaneously purported to administer more than four dozen dry needling injections to AD on September 22, 2016, just two weeks after his accident.

(x)    On September 6, 2016, two Insureds named AA and SA were involved in an automobile accident. Though AA and SA could not have experienced persistent pain symptoms or failed conservative treatments just one week after their accident, Parisien and PFJ Medical – at the direction of the Management Defendants – simultaneously purported to administer more than a dozen dry needling injections apiece, as well as multiple trigger point injections apiece, to AA and SA on September 13, 2016, just one week after their accident.

(xi)    On September 13, 2016, an Insured named ML was involved in an automobile accident. Though ML could not have experienced persistent pain symptoms or failed conservative treatments just two weeks after his accident, Lacina and FJL Medical – at the direction of the Management Defendants – simultaneously purported to administer more than two dozen dry needling injections to ML on September 26, 2016, just two weeks after her accident.

(xii)    On September 24, 2016, an Insured named FF was involved in an automobile accident. Though FF could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after his accident, Parisien and JPF Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 15 dry needling injections, as well as multiple trigger point injections, to FF on October 5, 2016, less than two weeks after his accident.

(xiii)    On October 17, 2016, an Insured named EB was involved in an automobile accident. Though EB could not have experienced persistent pain symptoms or failed conservative treatments less than a month after his accident, Parisien and

JPF Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 15 dry needling injections, as well as multiple trigger point injections, to EB on November 14, 2016, less than a month after his accident.

(xiv)   On October 20, 2016, an Insured named DD was involved in an automobile accident. Though DD could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after his accident, Parisien and JPF Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 15 dry needling injections, as well as multiple trigger point injections, to DD on October 31, 2016, less than two weeks after his accident.

(xv)   On November 3, 2016, an Insured named SA was involved in an automobile accident. Though SA could not have experienced persistent pain symptoms or failed conservative treatments the same day as his accident, Lacina and JFL Medical – at the direction of the Management Defendants – simultaneously purported to administer more than four dozen dry needling injections to SA on November 3, 2016, the same day as his accident.

(xvi)   On November 17, 2016, an Insured named FA was involved in an automobile accident. Though FA could not have experienced persistent pain symptoms or failed conservative treatments the same day as her accident, Lacina and JFL Medical – at the direction of the Management Defendants – simultaneously purported to administer more than three dozen dry needling injections to FA on November 17, 2016, the same day as her accident.

(xvii)   On January 13, 2017, an Insured named DC was involved in an automobile accident. Though DC could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after his accident, Parisien and JPF Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 15 dry needling injections, as well as multiple trigger point injections, to DC on January 24, 2017, less than two weeks after his accident.

(xviii)   On January 13, 2017, an Insured named AA was involved in an automobile accident. Though AA could not have experienced persistent pain symptoms or failed conservative treatments less than two weeks after his accident, Denobrega and JPF Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 45 dry needling injections, as well as multiple trigger point injections, to AA on January 26, 2017, less than two weeks after his accident.

(xix)   On January 25, 2017, an Insured named DA was involved in an automobile accident. Though DA could not have experienced persistent pain symptoms or failed conservative treatments just one week after his accident, Lacina and JFL

Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 30 dry needling injections to DA on February 1, 2017, just one week after his accident.

(xx)   On January 26, 2017, an Insured named SB was involved in an automobile accident. Though SB could not have experienced persistent pain symptoms or failed conservative treatments just three weeks after her accident, Denobrega and JPF Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 45 dry needling injections, as well as multiple trigger point injections, to SB on February 16, 2017, just three weeks after his accident.

(xxi)   On February 19, 2017, an Insured named JC was involved in an automobile accident. Though JC could not have experienced persistent pain symptoms or failed conservative treatments less than 10 days after his accident, Parisien and JPF Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 15 dry needling injections, as well as multiple trigger point injections, to JC on February 28, 2017, less than 10 days after his accident.

(xxii)   On March 22, 2017, an Insured named JC was involved in an automobile accident. Though JC could not have experienced persistent pain symptoms or failed conservative treatments just two weeks after his accident, Denobrega and JPF Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 35 dry needling injections to JC on April 7, 2017, just three weeks after his accident.

(xxiii)   On April 25, 2017, an Insured named RD was involved in an automobile accident. Though RD could not have experienced persistent pain symptoms or failed conservative treatments just two days after his accident, O'Brian and JPF Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 35 dry needling injections, as well as multiple trigger point injections, to RD on April 27, 2017, just two days after his accident.

(xxiv)   On May 1, 2017, an Insured named AA was involved in an automobile accident. Though AA could not have experienced persistent pain symptoms or failed conservative treatments just three days after his accident, O'Brian and JPF Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 35 dry needling injections, as well as multiple trigger point injections, to AA on May 4, 2017, just three days after his accident.

(xxv)   On May 7, 2017, an Insured named TB was involved in an automobile accident. Though TB could not have experienced persistent pain symptoms or failed conservative treatments less than one week after her accident, Lacina and JFL Medical – at the direction of the Management Defendants – simultaneously purported to administer more than 50 dry needling injections to TB on May 11,

2017, less than one week after her accident.

302.    These are only representative examples. In the dry needling injection claims identified in Exhibits "1" – "5", the Defendants routinely purported to perform and/or provide medically unnecessary dry needling to Insureds within less than one month after the Insureds' underlying automobile accidents, and often within days after the accidents, long before the Insureds could have tried and failed any course of legitimate, conservative treatment.

303.    The Defendants engaged in this conduct solely in order to maximize the fraudulent billing they could submit, or cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who were subjected to the injections.

304.    To further increase the fraudulent billing that they submitted for a medically-unnecessary dry needling injection, the Defendants routinely submitted a separate charge of $262.91, under CPT code 76942, for "ultrasound guidance" of the dry needling injections.

305.    The charges for "ultrasound guidance" of the injections were fraudulent inasmuch as, like the underlying dry needling injection itself, the ultrasound guidance was not medically necessary and was performed – to the extent that it was performed at all – pursuant to a pre-determined fraudulent protocol designed to maximize the Defendants' billing rather than to treat the Insureds who supposedly were subjected to it. Ultrasound guidance is not required to properly administer a dry needling injection.

306.    The Defendants purported to perform and/or provide these medically unnecessary dry needling injections because their focus was on generating profit, rather than on patient case, and because the Provider Defendants were operated pursuant to the pecuniary interests of the Management Defendants, rather than the legitimate medical judgment of true doctor-owners.

**4.    The Fraudulent Billing for Services Provided by Independent Contractors**

307.    The Defendants' fraudulent scheme also included submission of claims to GEICO seeking payment for services performed by independent contractors. Under the No-Fault Laws, healthcare providers are ineligible to bill or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the healthcare providers themselves, or by their employees.

308.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS).

309.    Parisien was the only healthcare services provider employed by JPF Medical and

PFJ Medical.

310.    Lacina was the only healthcare services provider employed by FJL Medical and JFL Medical.

311.    Monroe was the only healthcare services provider employed by HKM Medical.

312.    Denobrega and O'Brian were not employed by JPF Medical or PFJ Medical – rather, they were independent contractors of JPF Medical and PFJ Medical.

313.    Even so, the Defendants routinely submitted charges to GEICO and other insurers under the tax identification numbers of PFJ Medical, JPF Medical, JFL Medical, FJL Medical, and HKM Medical for Fraudulent Services that were provided – to the extent that they were provided at all – by professionals other than Parisien, Lacina, or Monroe.

314.    To the extent that they were performed in the first instance, all of the Fraudulent Services performed by healthcare providers other than Parisien, Lacina, or Monroe – including but not limited to Fraudulent Services performed by Denobrega and O'Brian – were performed by physicians, nurse practitioners, physical therapists, or unlicensed individuals whom the Defendants treated as independent contractors.

315.    For instance, the Defendants:

(i)      paid the physicians, nurse practitioners, physical therapists, or unlicensed individuals, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)     established an understanding with the physicians, nurse practitioners, physical therapists, or unlicensed individuals that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to the physicians, nurse practitioners, physical therapists, or unlicensed individuals;

(iv)     failed to secure and maintain W-4 or I-9 forms for the physicians, nurse practitioners, physical therapists, or unlicensed individuals;

(v)      failed to withhold federal, state or city taxes on behalf of the physicians, nurse practitioners, physical therapists, or unlicensed individuals;

(vi)      compelled the physicians, nurse practitioners, physical therapists, or unlicensed individuals to pay for their own malpractice insurance at their own expense;

(vii)      permitted the physicians, nurse practitioners, physical therapists, or unlicensed individuals to set their own schedules and days on which they desired to perform services;

(viii)      permitted the physicians, nurse practitioners, physical therapists, or unlicensed individuals to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)      failed to cover the physicians, nurse practitioners, physical therapists, or unlicensed individuals for either unemployment or workers' compensation benefits; and

(x)      filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians, nurse practitioners, physical therapists, or unlicensed individuals were independent contractors.

316.      By electing to treat the physicians, nurse practitioners, physical therapists, or unlicensed individuals as independent contractors, the Defendants realized significant economic benefits – for instance:

(i)      avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)      avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)      avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)      avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)      avoiding the need to secure any malpractice insurance; and

(vi)      avoiding claims of agency-based liability arising from work performed by the physicians, nurse practitioners, physical therapists, or unlicensed individuals.

317.     Because the physicians, nurse practitioners, physical therapists, or unlicensed individuals were independent contractors and performed the Fraudulent Services, the Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

318.     The Defendants billed for the Fraudulent Services as if they were provided by actual employees of the Provider Defendants to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

319.     In some cases, the Defendants attempted to conceal the fact that the Fraudulent Services were performed by independent contractors by falsely listing Parisien, Lacina, or Monroe on the billing as the treating provider, or by falsely contending – in their billing for the Fraudulent Services – that the physicians, nurse practitioners, physical therapists, or unlicensed individuals were employees of the Provider Defendants.

## IV.     The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO

320.     To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms and treatment reports through the Provider Defendants to GEICO seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

321.     The NF-3 forms and treatment reports submitted to GEICO by and on behalf of the Defendants were false and misleading in the following material respects:

    (i)    The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services actually were performed. In fact, the Fraudulent Services were not medically necessary, in many cases were not actually performed, and were performed – to the extent that they were performed at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the

Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

(ii)    The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented and exaggerated the level of the Fraudulent Services and the nature of the Fraudulent Services that purportedly were provided.

(iii)   The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Provider Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not properly licensed in they were putative healthcare practices that illegally were owned and controlled by unlicensed individuals, and which illegally split fees with unlicensed individuals.

(iv)   The NF-3 forms and treatment reports submitted by and on behalf of the Defendants uniformly misrepresented to GEICO that the Provider Defendants were are in compliance with all material licensing laws and, therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the Provider Defendants were not in compliance with all material licensing laws in that they paid illegal kickbacks for patient referrals.

(v)    In many cases, the NF-3 forms and treatment reports submitted by and on behalf of the Defendants misrepresented to GEICO that the Provider Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that supposedly were performed. In fact, the Provider Defendants were not eligible to seek or pursue collection of No-Fault Benefits for the services that supposedly were performed because the services were not provided by the Provider Defendants' employees

## V.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

322.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

323.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

324.    Specifically, they knowingly misrepresented and concealed facts related to the Provider Defendants in an effort to prevent discovery that the Provider Defendants were

fraudulently licensed, unlawfully split fees with unlicensed persons, and/or unlawfully paid kickbacks for patient referrals.

325.    Additionally, the Defendants entered into complex financial arrangements with one another and with others that were designed to, and did, conceal that fact that the Provider Defendants were fraudulently licensed, unlawfully split fees with unlicensed persons, and unlawfully paid kickbacks in exchange for patient referrals.

326.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed pursuant to a fraudulent predetermined protocol designed to maximize the charges that could be submitted.

327.    In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the physicians, nurse practitioners, physical therapists, and unlicensed individuals with the Provider Defendants in order to prevent GEICO from discovering that the physicians, nurse practitioners, physical therapists, and unlicensed individuals performing many of the Fraudulent Services – to the extent that they were performed at all – were not employed by the Provider Defendants. In many cases, the Defendants actually misrepresented the identity of the individual who purportedly performed the Fraudulent Services, or falsely claimed that the individuals providing the Fraudulent Services were employees of the Provider Defendants, in order to conceal the fact that the services were performed by independent contractors.

328.    What is more, the Defendants billed for the Fraudulent Services through multiple individuals and entities using multiple tax identification numbers in order to reduce the amount of billing submitted through any single individual or entity or under any single tax identification

number, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

329.    Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate. Nevertheless, in an attempt to conceal their fraud, the Defendants systematically failed and/or refused to respond to repeated requests for verification of the charges submitted.

330.    GEICO maintains standard office practices and procedures that are designed to and do ensure that no-fault claim denial forms or requests for additional verification of no-fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

331.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely and appropriately denied the pending claims for No-Fault Benefits submitted through the Defendants; or (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the defendants (yet GEICO failed to obtain compliance with the requests for additional verification), and, therefore, GEICO's time to pay or deny the claims has not yet expired.

332.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation against GEICO and other insurers if the charges were not promptly paid in full.

333.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the

fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $930,000.00 based upon the fraudulent charges.

334.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against the Provider Defendants
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

335.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

336.    There is an actual case in controversy between GEICO and the Provider Defendants regarding more than $1,000,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

337.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

338.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services never were provided in the first instance.

339.    The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the Fraudulent Services misrepresented

and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

340. The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were provided – to the extent that they were provided at all – pursuant to illegal kickback arrangements between the Defendants and others.

341. The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because, in many cases, the Fraudulent Services – to the extent that they were provided at all – were provided by independent contractors, rather than by the Provider Defendants' employees.

342. The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants were fraudulently licensed, owned, and controlled by unlicensed individuals and, therefore, were ineligible to bill for or to collect no-fault benefits.

343. The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants unlawfully split fees with unlicensed individuals and, therefore, were ineligible to bill for or to collect No-Fault Benefits.

344. The Provider Defendants have no right to receive payment for any pending bills submitted to GEICO because the Provider Defendants have failed and/or refused to comply with GEICO's lawful requests for additional verification.

345. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO.

**SECOND CAUSE OF ACTION**
**Against Parisien and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

346.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

347.    PFJ Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

348.    Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the PFJ Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that PFJ Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by PFJ Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1."

349.    PFJ Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Parisien and the Management Defendants operated PFJ Medical, inasmuch as PFJ Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for PFJ Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through PFJ Medical to the present day.

350.    PFJ Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. PFJ Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by PFJ Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

351.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $210,000.00 pursuant to the fraudulent bills submitted by the Defendants through PFJ Medical.

352.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Parisien, the Management Defendants, Denobrega, and O'Brian**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

353.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

354.    PFJ Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

355.    Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian are employed by and/or associated with PFJ Medical.

356.    Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the PFJ Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over two years seeking payments that PFJ Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by PFJ Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the

pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

357.    Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

358.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $210,000.00 pursuant to the fraudulent bills submitted by the Defendants through the PFJ Medical.

359.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FOURTH CAUSE OF ACTION
**Against PFJ Medical, Parisien, the Management Defendants, Denobrega, and O'Brian**
**(Common Law Fraud)**

360.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

361.    PFJ Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

362.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that PFJ Medical was properly licensed,

and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that PFJ Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact PFJ Medical was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Parisien, the representation that the billed-for services were performed by PFJ Medical's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

363.  PFJ Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian  intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through PFJ Medical that were not compensable under the No-Fault Laws.

364.  GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $210,000.00 pursuant to the fraudulent bills submitted by the Defendants through PFJ Medical.

365.  The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

366.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against PFJ Medical, Parisien, the Management Defendants, Denobrega, and O'Brian
(Unjust Enrichment)**

367.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

368.    As set forth above, PFJ Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian  have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

369.    When GEICO paid the bills and charges submitted by or on behalf of PFJ Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

370.    PFJ Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian  have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

371.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

372.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $210,000.00.

## SIXTH CAUSE OF ACTION
### Against Parisien and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

373.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

374.    JPF Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

375.    Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the JPF Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking payments that JPF Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by JPF Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2."

376.    JPF Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Parisien and the Management Defendants operated JPF Medical, inasmuch as JPF Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for JPF Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through JPF Medical to the present day.

377.    JPF Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. JPF Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by JPF Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

378.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $432,000.00 pursuant to the fraudulent bills submitted by the Defendants through JPF Medical.

379.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against Parisien, the Management Defendants, Denobrega, and O'Brian
### (Violation of RICO, 18 U.S.C. § 1962(d))

380.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

381.    JPF Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

382.    Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian are employed by and/or associated with JPF Medical.

383.    Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the JPF Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking payments that JPF Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by JPF Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified

through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

384.    Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

385.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $432,000.00 pursuant to the fraudulent bills submitted by the Defendants through the JPF Medical.

386.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against JPF Medical, Parisien, the Management Defendants, Denobrega, and O'Brian (Common Law Fraud)

387.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

388.    JPF Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

389.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that JPF Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11

101

NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that JPF Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact JPF Medical was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Parisien, the representation that the billed-for services were performed by JPF Medical's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

390.    JPF Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through JPF Medical that were not compensable under the No-Fault Laws.

391.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $432,000.00 pursuant to the fraudulent bills submitted by the Defendants through JPF Medical.

392.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

393.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against JPF Medical, Parisien, the Management Defendants, Denobrega, and O'Brian
### (Unjust Enrichment)

394.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

395.    As set forth above, JPF Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

396.    When GEICO paid the bills and charges submitted by or on behalf of JPF Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

397.    JPF Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

398.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

399.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $432,000.00.

### TENTH CAUSE OF ACTION
### Against Monroe and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

400.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

401.    HKM Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

402.    Monroe, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the HKM Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking payments that HKM Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by HKM Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3."

403.    HKM Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Monroe and the Management Defendants operated HKM Medical, inasmuch as HKM Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for HKM Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through HKM Medical to the present day.

404.    HKM Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently owned and controlled by non-physicians, and unlawfully pays for patient referrals. HKM Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by HKM Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

405.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $23,000.00 pursuant to the fraudulent bills submitted by the Defendants through HKM Medical.

406.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against Monroe and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

407.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

408.    HKM Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

409.    Monroe, Tuano, Tanglao, and John Doe Defendants 1-10 are employed by and/or associated with HKM Medical.

410.    Monroe, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the HKM Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking payments that HKM Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by HKM Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified

through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

411.    Monroe, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

412.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $23,000.00 pursuant to the fraudulent bills submitted by the Defendants through the HKM Medical.

413.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Monroe and the Management Defendants
### (Common Law Fraud)

414.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

415.    Monroe, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

416.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that HKM Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law §

5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that HKM Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact HKM Medical was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Monroe, the representation that the billed-for services were performed by HKM Medical's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

417.    Monroe, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through HKM Medical that were not compensable under the No-Fault Laws.

418.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $23,000.00 pursuant to the fraudulent bills submitted by the Defendants through HKM Medical.

419.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

420.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### THIRTEENTH CAUSE OF ACTION
**Against Monroe and the Management Defendants**
**(Unjust Enrichment)**

421.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

422.    As set forth above, Monroe, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

423.    When GEICO paid the bills and charges submitted by or on behalf of HKM Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

424.    Monroe, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

425.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

426.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $23,000.00.

### FOURTEENTH CAUSE OF ACTION
**Against Lacina and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

427.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

428.    JFL Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

429.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the JFL Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking payments that JFL Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by JFL Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4."

430.    JFL Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lacina and the Management Defendants operated JFL Medical, inasmuch as JFL Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for JFL Medical to function. Furthermore, the

intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through JFL Medical to the present day.

431.    JFL Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. JFL Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by JFL Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

432.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $160,000.00 pursuant to the fraudulent bills submitted by the Defendants through JFL Medical.

433.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### FIFTEENTH CAUSE OF ACTION
**Against Lacina and the Management Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

434.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

435.    JFL Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

436.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 are employed by and/or associated with JFL Medical.

437.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the JFL Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking payments that JFL Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by JFL Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

438.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

112

439.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $160,000.00 pursuant to the fraudulent bills submitted by the Defendants through the JFL Medical.

440.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

<u>**SIXTEENTH CAUSE OF ACTION**</u>
**Against JFL Medical, Lacina, and the Management Defendants**
**(Common Law Fraud)**

441.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

442.    JFL Medical, Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

443.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that JFL Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that JFL Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact JFL Medical was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically

113

necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Lacina, the representation that the billed-for services were performed by JFL Medical's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

444.   JFL Medical, Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through JFL Medical that were not compensable under the No-Fault Laws.

445.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $160,000.00 pursuant to the fraudulent bills submitted by the Defendants through JFL Medical.

446.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

447.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### SEVENTEENTH CAUSE OF ACTION
**Against JFL Medical, Lacina, and the Management Defendants
(Unjust Enrichment)**

448.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

449.    As set forth above, Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

450.    When GEICO paid the bills and charges submitted by or on behalf of JFL Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

451.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

452.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

453.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $160,000.00.

## EIGHTEENTH CAUSE OF ACTION
### Against Lacina and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

454.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

455.    FJL Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

456.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly conducted and/or participated, directly or indirectly, in the conduct of the FJL Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking

payments that FJL Medical was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by FJL Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5."

457.    FJL Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Lacina and the Management Defendants operated FJL Medical, inasmuch as FJL Medical never was eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for FJL Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through FJL Medical to the present day.

458.    FJL Medical is engaged in inherently unlawful acts inasmuch as its very existence is an unlawful act, considering that it is fraudulently licensed, owned and controlled by non-physicians, and unlawfully pays for patient referrals. FJL Medical likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing

submitted to GEICO and other insurers. These inherently unlawful acts are taken by FJL Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

459.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $105,000.00 pursuant to the fraudulent bills submitted by the Defendants through FJL Medical.

460.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINETEENTH CAUSE OF ACTION
### Against Lacina and the Management Defendants
### (Violation of RICO, 18 U.S.C. § 1962(d))

461.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

462.    FJL Medical is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

463.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 are employed by and/or associated with FJL Medical.

464.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the FJL Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over one year seeking payments that FJL Medical was not eligible to receive under the No-Fault Laws

because: (i) it was unlawfully licensed, owned and controlled by non-physicians; (ii) it engaged in fee-splitting with non-physicians and paid kickbacks in exchange for patient referrals; (iii) the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and frequently were not performed at all; (iv) the billed-for services were performed by independent contractors, rather than by FJL Medical employees; and (v) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

465.    Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

466.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $105,000.00 pursuant to the fraudulent bills submitted by the Defendants through the FJL Medical.

467.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTIETH CAUSE OF ACTION
### Against FJL Medical, Lacina, and the Management Defendants
### (Common Law Fraud)

468.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

469.    FJL Medical, Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

470.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that FJL Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it was fraudulently licensed and actually owned and controlled by non-physicians; (ii) in every claim, the representation that FJL Medical was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact FJL Medical was not properly licensed in that it engaged in illegal fee-splitting with non-physicians and paid illegal kickbacks for patient referrals; (iii) in every claim, the representation that the billed-for services were medically necessary, when in fact the billed-for services were not medically necessary, were performed pursuant to a pre-determined, fraudulent protocol designed solely to enrich the Defendants, and in many cases were not performed at all; (iv) in every claim for services not actually performed by Lacina, the representation that the billed-for services were performed by FJL Medical's employees, when in fact the billed-for services were performed – to the extent that they were performed at all – by independent contractors.

471.    FJL Medical, Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through FJL Medical that were not compensable under the No-Fault Laws.

472.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $105,000.00 pursuant to the fraudulent bills submitted by the Defendants through FJL Medical.

473.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

474.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
### Against FJL Medical, Lacina and the Management Defendants
### (Unjust Enrichment)

475.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

476.    As set forth above, FJL Medical, Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

477.    When GEICO paid the bills and charges submitted by or on behalf of FJL Medical for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

478.    FJL Medical, Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

479.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

480.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $105,000.00.

## TWENTY-SECOND CAUSE OF ACTION
### Against Parisien
### (Breach of Contract and Warranty)

481.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

482.    As set forth above, pursuant to the August 2016 settlement agreement in the First Parisien Action, Parisien warranted and represented that – other than an entity called Francois Jules Parisien M.D., P.C. – he owned no other professional entities, regardless of form, that had submitted any billing of any kind to GEICO that remained outstanding and unpaid.

483.    However, on August 26, 2016 – the date when Parisien executed the settlement agreement in the First Parisien Action – Parisien purported to be the owner of record of PFJ Medical.

484.    What is more, on August 26, 2016 – the date when Parisien executed the settlement agreement in the First Parisien Action – PFJ Medical had thousands of dollars in outstanding billing to GEICO.

485.    Plaintiffs relied on Parisien's representations and warranties, and entered into the settlement agreement in the First Parisien Action in reliance on Parisien's representations and

warranties.

486.    Pursuant to the terms of the settlement agreement in the First Parisien Action, Parisien agreed that neither he, nor any medical practice he owned, would bill GEICO for more than two dry needling treatments provided to any individual Insured within a 60 day period.

487.    Plaintiffs fully performed their obligations under the settlement agreement in the First Parisien Action.

488.    Even so, Parisien breached his obligations under the settlement agreement, by permitting JPF Medical and PFJ Medical to routinely bill GEICO for dozens of individual charges for individual dry needling treatments provided to individual Insureds on individual dates of service.

489.    Consequently, Plaintiffs have been damaged in an amount to be determined at trial.

## TWENTY-THIRD CAUSE OF ACTION
### Against Lacina
### (Breach of Contract and Warranty)

490.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs set forth above.

491.    As set forth above, pursuant to the August 2016 settlement agreement in the First Parisien Action, Lacina warranted and represented that – other than an entity called RA Medical Services, P.C. – he owned no other professional entities, regardless of form, that had submitted any billing of any kind to GEICO that remained outstanding and unpaid.

492.    However, on August 24, 2016 – the date when Lacina executed the settlement agreement in the First Parisien Action – Lacina purported to be the owner of record of FJL Medical.

493.    What is more, on August 24, 2016 – the date when Lacina executed the settlement agreement in the First Parisien Action – FJL Medical had thousands of dollars in outstanding billing to GEICO.

494.    Plaintiffs relied on Lacina's representations and warranties, and entered into the settlement agreement in the First Parisien Action in reliance on Lacina's representations and warranties.

495.    Pursuant to the terms of the settlement agreement in the First Parisien Action, Lacina agreed that neither he, nor any medical practice he owned, would bill GEICO for more than two dry needling treatments provided to any individual Insured within a 60 day period.

496.    Plaintiffs fully performed their obligations under the settlement agreement in the First Parisien Action.

497.    Even so, Lacina breached his obligations under the settlement agreement, by permitting JLF Medical and FJL Medical to routinely bill GEICO for dozens of individual charges for individual dry needling treatments provided to individual Insureds on individual dates of service.

498.    Consequently, Plaintiffs have been damaged in an amount to be determined at trial.

## JURY DEMAND

499.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.    On the First Cause of Action against the Provider Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Provider Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $210,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.    On the Third Cause of Action against Parisien, Tuano, Tanglao, John Doe Defendants 1-10 , Denobrega, and O'Brian, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $210,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against PFJ Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $210,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.    On the Fifth Cause of Action against PFJ Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10, Denobrega, and O'Brian, more than $210,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

F.    On the Sixth Cause of Action against Parisien, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $432,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.    On the Seventh Cause of Action against Parisien, Tuano, Tanglao, John Doe Defendants 1-10 , Denobrega, and O'Brian, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $432,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.    On the Eighth Cause of Action against JPF Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10 , Denobrega, and O'Brian, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $432,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

I.    On the Ninth Cause of Action against JPF Medical, Parisien, Tuano, Tanglao, John Doe Defendants 1-10 , Denobrega, and O'Brian, more than $432,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

J.    On the Tenth Cause of Action against Monroe, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $23,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

K.    On the Eleventh Cause of Action against Monroe, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $23,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.    On the Twelfth Cause of Action against Monroe, Tuano, Tanglao, and John Doe Defendants 1-10, compensatory damages in favor of GEICO in an amount to be determined at

trial but in excess of $23,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

M.    On the Thirteenth Cause of Action against Monroe, Tuano, Tanglao, and John Doe Defendants 1-10, more than $23,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

N.    On the Fourteenth Cause of Action against Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $160,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.    On the Fifteenth Cause of Action against Lacina, Tuano, Tanglao, John Doe Defendants 1-10 , Denobrega, and O'Brian, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $160,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.    On the Sixteenth Cause of Action against JFL Medical, Lacina, Tuano, Tanglao, John Doe Defendants 1-10 , Denobrega, and O'Brian, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $160,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.    On the Seventeenth Cause of Action against JFL Medical, Lacina, Tuano, Tanglao, John Doe Defendants 1-10 , Denobrega, and O'Brian, more than $160,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

R.    On the Eighteenth Cause of Action against Lacina, Tuano, Tanglao, and John Doe Defendants 1-10 , compensatory damages in favor of GEICO in an amount to be determined at

trial but in excess of $105,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S.     On the Nineteenth Cause of Action against Lacina, Tuano, Tanglao, John Doe Defendants 1-10 , Denobrega, and O'Brian, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $105,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.     On the Twentieth Cause of Action against FJL Medical, Lacina, Tuano, Tanglao, John Doe Defendants 1-10 , Denobrega, and O'Brian, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $105,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.     On the Twenty-First Cause of Action against FJL Medical, Lacina, Tuano, Tanglao, John Doe Defendants 1-10 , Denobrega, and O'Brian, more than $105,000.00 for unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper;

V.     On the Twenty-Second Cause of Action against Parisien, for an amount to be determined at trial, plus attorneys' fees, costs, and interest and such other and further relief as this Court deems just and proper; and

W.     On the Twenty-Third Cause of Action against Lacina, for an amount to be determined at trial, plus attorneys' fees, costs, and interest and such other and further relief as this Court deems just and proper.

Dated: April 12, 2018

RIVKIN RADLER LLP

By: _____
Max Gershenoff (MG 4648)
Joshua D. Smith (JS 3989)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company*